# Exhibit 1

Received
10/1/18

CIRCUIT COURT FOR BALTIMORE CITY
Marilyn Bentley
Clerk of the Circuit Court
Courthouse East
111 North Calvert Street
Room 462
Baltimore, MD 21202-
(410)-333-3722, TTY for Deaf: (410)-333-4389

W R I T   O F   S U M M O N S   ( P r i v a t e   P r o c e s s )
Case Number: 24-C-18-004935 OT
C I V I L
Chasity Spears, et al vs TCB Pedestal Gardens LLC, et al

STATE OF MARYLAND, BALTIMORE CITY, TO WIT:

    To: MWR INVESTIGATIONS INC
        S/O: R/A: Michael W. Rice
        6155 Shadywood Road, Unit 404
        Elkridge, MD 21075

You are hereby summoned to file a written response by pleading or motion, within 30 days after service of this summons upon you, in this court, to the attached Complaint filed by:  Chasity Spears
                                          C/o Murphy, Falcon & Murphy, P.A.
                                          One South Street, 23rd Floor
                                          Baltimore, MD 21202

WITNESS the Honorable Chief Judge of the Eighth Judicial Circuit of Maryland

Date Issued:  08/30/18

Marilyn Bentley
Clerk of the Circuit Court

To the person summoned:

FAILURE TO FILE A RESPONSE WITHIN THE TIME ALLOTTED MAY RESULT IN A JUDGMENT BY DEFAULT OR THE GRANTING OF THE RELIEF SOUGHT AGAINST YOU.

Personal attendance in court on the day named is NOT required.

IN THE CIRCUIT COURT FOR Baltimore City
_(City or County)_

# CIVIL – NON-DOMESTIC CASE INFORMATION REPORT

## DIRECTIONS

*Plaintiff*: This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111(a).

*Defendant*: You must file an Information Report as required by Rule 2-323(h).

***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING***

FORM FILED BY: ☒PLAINTIFF  ☐DEFENDANT   CASE NUMBER _____
_(Clerk to insert)_

CASE NAME: Chasity Spears, et al.   vs.   TCB Pedestal Gardens, LLC, et al.
    _Plaintiff_                                _Defendant_

PARTY'S NAME: Chasity Spears                       PHONE: 410-951-8744

PARTY'S ADDRESS: c/o MFM, 1 South Street, 23rd Floor, Baltimore, Maryland 21202

PARTY'S E-MAIL: edward.cardona@murphyfalcon.com

**If represented by an attorney:**

PARTY'S ATTORNEY'S NAME: Nicholas Szokoly

PHONE: 410-951-8744

PARTY'S ATTORNEY'S ADDRESS: 1 South Street, 23rd Floor, Baltimore, Maryland 21202

PARTY'S ATTORNEY'S E-MAIL: edward.cardona@murphyfalcon.com

JURY DEMAND? ☒Yes ☐No

RELATED CASE PENDING? ☐Yes ☒No  If yes, Case #(s), if known: _____

ANTICIPATED LENGTH OF TRIAL?: _____ hours  5  days

## PLEADING TYPE

New Case: ☒Original   ☐Administrative Appeal   ☐Appeal

Existing Case: ☐Post-Judgment   ☐Amendment

*If filing in an existing case, skip Case Category/ Subcategory section - go to Relief section.*

## IF NEW CASE: CASE CATEGORY/SUBCATEGORY (*Check one box.*)

**TORTS**
- ☐ Asbestos
- ☐ Assault and Battery
- ☐ Business and Commercial
- ☐ Conspiracy
- ☐ Conversion
- ☐ Defamation
- ☐ False Arrest/Imprisonment
- ☐ Fraud
- ☐ Lead Paint - DOB of Youngest Plt: _____
- ☐ Loss of Consortium
- ☐ Malicious Prosecution
- ☐ Malpractice-Medical
- ☐ Malpractice-Professional
- ☐ Misrepresentation
- ☐ Motor Tort
- ☒ Negligence
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability
- ☐ Specific Performance
- ☐ Toxic Tort
- ☐ Trespass
- ☐ Wrongful Death

**CONTRACT**
- ☐ Asbestos
- ☐ Breach
- ☐ Business and Commercial
- ☐ Confessed Judgment (Cont'd)
- ☐ Construction
- ☐ Debt
- ☐ Fraud

- ☐ Government
- ☐ Insurance
- ☐ Product Liability

**PROPERTY**
- ☐ Adverse Possession
- ☐ Breach of Lease
- ☐ Detinue
- ☐ Distress/Distrain
- ☐ Ejectment
- ☐ Forcible Entry/Detainer
- ☐ Foreclosure
  - ☐ Commercial
  - ☐ Residential
  - ☐ Currency or Vehicle
  - ☐ Deed of Trust
  - ☐ Land Installments
  - ☐ Lien
  - ☐ Mortgage
  - ☐ Right of Redemption
  - ☐ Statement Condo
- ☐ Forfeiture of Property / Personal Item
- ☐ Fraudulent Conveyance
- ☐ Landlord-Tenant
- ☐ Lis Pendens
- ☐ Mechanic's Lien
- ☐ Ownership
- ☐ Partition/Sale in Lieu
- ☐ Quiet Title
- ☐ Rent Escrow
- ☐ Return of Seized Property
- ☐ Right of Redemption
- ☐ Tenant Holding Over

**PUBLIC LAW**
- ☐ Attorney Grievance
- ☐ Bond Forfeiture Remission
- ☐ Civil Rights
- ☐ County/Mncpl Code/Ord
- ☐ Election Law
- ☐ Eminent Domain/Condemn.
- ☐ Environment
- ☐ Error Coram Nobis
- ☐ Habeas Corpus
- ☐ Mandamus
- ☐ Prisoner Rights
- ☐ Public Info. Act Records
- ☐ Quarantine/Isolation
- ☐ Writ of Certiorari

**EMPLOYMENT**
- ☐ ADA
- ☐ Conspiracy
- ☐ EEO/HR
- ☐ FLSA
- ☐ FMLA
- ☐ Workers' Compensation
- ☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
- ☐ Assumption of Jurisdiction
- ☐ Authorized Sale
- ☐ Attorney Appointment
- ☐ Body Attachment Issuance
- ☐ Commission Issuance

- ☐ Constructive Trust
- ☐ Contempt
- ☐ Deposition Notice
- ☐ Dist Ct Mtn Appeal
- ☐ Financial
- ☐ Grand Jury/Petit Jury
- ☐ Miscellaneous
- ☐ Perpetuate Testimony/Evidence
- ☐ Prod. of Documents Req.
- ☐ Receivership
- ☐ Sentence Transfer
- ☐ Set Aside Deed
- ☐ Special Adm. - Atty
- ☐ Subpoena Issue/Quash
- ☐ Trust Established
- ☐ Trustee Substitution/Removal
- ☐ Witness Appearance-Compel

**PEACE ORDER**
- ☐ Peace Order

**EQUITY**
- ☐ Declaratory Judgment
- ☐ Equitable Relief
- ☐ Injunctive Relief
- ☐ Mandamus

**OTHER**
- ☐ Accounting
- ☐ Friendly Suit
- ☐ Grantor in Possession
- ☐ Maryland Insurance Administration
- ☐ Miscellaneous
- ☐ Specific Transaction
- ☐ Structured Settlements

CC-DCM-002 (Rev. 04/2017)          Page 1 of 3

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

- ☐ Abatement
- ☐ Administrative Action
- ☐ Appointment of Receiver
- ☐ Arbitration
- ☐ Asset Determination
- ☐ Attachment b/f Judgment
- ☐ Cease & Desist Order
- ☐ Condemn Bldg
- ☐ Contempt
- ☐ Court Costs/Fees
- ☐ Damages-Compensatory
- ☐ Damages-Punitive

- ☐ Earnings Withholding
- ☐ Enrollment
- ☐ Expungement
- ☐ Findings of Fact
- ☐ Foreclosure
- ☐ Injunction
- ☐ Judgment-Affidavit
- ☐ Judgment-Attorney Fees
- ☐ Judgment-Confessed
- ☐ Judgment-Consent
- ☐ Judgment-Declaratory
- ☐ Judgment-Default

- ☐ Judgment-Interest
- ☐ Judgment-Summary
- ☐ Liability
- ☐ Oral Examination
- ☐ Order
- ☐ Ownership of Property
- ☐ Partition of Property
- ☐ Peace Order
- ☐ Possession
- ☐ Production of Records
- ☐ Quarantine/Isolation Order
- ☐ Reinstatement of Employment

- ☐ Return of Property
- ☐ Sale of Property
- ☐ Specific Performance
- ☐ Writ-Error Coram Nobis
- ☐ Writ-Execution
- ☐ Writ-Garnish Property
- ☐ Writ-Garnish Wages
- ☐ Writ-Habeas Corpus
- ☐ Writ-Mandamus
- ☐ Writ-Possession

*If you indicated **Liability** above*, mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.  ☐ Liability is not conceded, but is not seriously in dispute. ☐ Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

☐ Under $10,000    ☐ $10,000 - $30,000    ☐ $30,000 - $100,000    ☒ Over $100,000

☒ Medical Bills $ Excess$75k    ☐ Wage Loss $ Excess$75k    ☐ Property Damages $ Excess$75k

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)

A. Mediation          ☐ Yes ☒ No              C. Settlement Conference  ☒ Yes ☐ No
B. Arbitration        ☐ Yes ☒ No              D. Neutral Evaluation     ☐ Yes ☒ No

## SPECIAL REQUIREMENTS

☐ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated **LENGTH OF TRIAL**.*    ***(Case will be tracked accordingly)***

☐ 1/2 day of trial or less          ☐ 3 days of trial time

☐ 1 day of trial time               ☒ More than 3 days of trial time

☐ 2 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

***For all jurisdictions***, *if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited**- Trial within 7 months of          ☐ **Standard** - Trial within 18 months of
Defendant's response                                Defendant's response

EMERGENCY RELIEF REQUESTED

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited** - Trial within 7 months of Defendant's response        ☐ **Standard** - Trial within 18 months of Defendant's response

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY, OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | | |
|---|---|---|
| ☐ | Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☒ | Civil-Short | Trial 210 days from first answer. |
| ☐ | Civil-Standard | Trial 360 days from first answer. |
| ☐ | Custom | Scheduling order entered by individual judge. |
| ☐ | Asbestos | Special scheduling order. |
| ☐ | Lead Paint | Fill in: Birth Date of youngest plaintiff ........................................... . |
| ☐ | Tax Sale Foreclosures | Special scheduling order. |
| ☐ | Mortgage Foreclosures | No scheduling order. |

### CIRCUIT COURT FOR BALTIMORE COUNTY

| | | |
|---|---|---|
| ☐ | Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ | Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ | Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ | Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

08/30/2018
Date

Murphy & Falcon-1 South Street, 23rd Floor
Address

Baltimore                MD        21202
City                     State      Zip Code

Signature of Counsel / Party

Edward L. Cardona III
Printed Name

CC-DCM-002 (Rev. 04/2017)          Page 3 of 3

**CHASITY SPEARS**
c/o Murphy, Falcon & Murphy, P.A.
One South Street, 23rd Floor
Baltimore, MD 21202[1];

and

**GABRIELLE SPEARS**
(a minor by her parent and next friend,
Chasity Spears)
c/o Murphy, Falcon & Murphy, P.A.
One South Street, 23rd Floor
Baltimore, MD 21202

and

**NAHLA SPEARS**
(a minor by her parent and next friend,
Chasity Spears)
c/o Murphy, Falcon & Murphy, P.A.
One South Street, 23rd Floor
Baltimore, MD 21202

*Plaintiffs,*

v.

**TCB PEDESTAL GARDENS LLC**
7 Saint Paul Street, Ste. 820
Baltimore, MD 21202

    Serve on Resident Agent:
    CSC-Lawyers Incorporating Service Co.
    7 Saint Paul Street, Ste. 820
    Baltimore, MD 21202

and

**INTERSTATE REALTY
MANAGEMENT COMPANY**
3 East Stow Road, Ste. 100
Marlton, NJ 08053

\*    IN THE

\*

\*    CIRCUIT COURT

\*

\*

\*    FOR

\*

\*    BALTIMORE CITY

\*

\*    CASE NO. _____

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

---

[1] The Plaintiffs fear for their safety from retaliation by persons aligned with their attackers. While Plaintiffs' City and State of residency are set forth below, they have opted to use the address of their Counsel for all Court notices.

Serve on Resident Agent:                                    *
National Registered Agents, Inc. of MD
2405 York Road, Ste. 201                                    *
Lutherville-Timonium, MD 21093
                                                            *
and
                                                            *
**ALEXANDER SECURITY**
**CONSULTANTS, LLC**                                        *
12404 Lytton Avenue
Brandywine, MD 20613                                        *

Serve on Resident Agent:                                    *
Charles Pearson
107 Swan Creek Road                                         *
Fort Washington, MD 20744
                                                            *
and
                                                            *
**MWR INVESTIGATIONS INC.**
6155 Shadywood Road, Unit 404                               *
Elkridge, MD 21075
                                                            *
Serve on Resident Agent:
Michael W. Rice                                             *
6155 Shadywood Road, Unit 404
Elkridge, MD 21075                                          *

and                                                         *

**THE COMMUNITY BUILDERS, INC.**                            *
185 Dartmouth Street, Suite 900
Boston, MA 02116                                            *

Serve on Resident Agent:                                    *
CSC-Lawyers Incorporating Service Co.
7 Saint Paul Street, Ste. 820                               *
Baltimore, MD 21202
                                                            *
         *Defendants.*

*       *       *       *       *       *       *       *       *       *       *       *       *

2

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Chasity Spears, Gabrielle Spears (a minor by her parent and next friend, Chasity Spears), and Nahla Spears (a minor by her parent and next friend, Chasity Spears), by and through undersigned counsel, hereby file suit against TCB Pedestal Gardens LLC, Interstate Realty Management Company, Alexander Security Consultants, LLC, MWR Investigations Inc. and The Community Builders, Inc. (collectively, "Defendants"), and state in support thereof as follows:

### JURISDICTION AND VENUE

1.      Jurisdiction is proper in the Circuit Court for Baltimore City pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 6-102 and 6-103 because Defendants have an interest in property and/or conduct business in Maryland.

2.      Venue, as conferred under Md. Code Ann., Cts. & Jud. Proc. §§ 6-201 and 6-202, is proper in Baltimore City because the acts giving rise to the claims occurred in Baltimore City, Maryland, and Defendants either reside in and/or carry on regular business in Baltimore City, Maryland.

3.      The amount of this claim exceeds $30,000.00.

### FACTS COMMON TO ALL COUNTS

4.      Chasity Spears ("Ms. Spears") is a natural person and an African American resident of Baltimore City, Maryland, and, at all times relevant herein, a resident of Pedestal Gardens. On or about November 19, 2013, Ms. Spears signed a lease and moved into her apartment unit in Pedestal Gardens.

5.      Gabrielle Spears ("Gabrielle") is a natural person and an African American minor, a resident of Baltimore City, Maryland, and, at all times relevant herein, a resident of Pedestal

3

Gardens. On or about November 19, 2013, Gabrielle moved into Pedestal Gardens with her mother, Ms. Spears.

6.      Nahla Spears ("Nahla") is a natural person and an African American minor, a resident of Baltimore City, Maryland, and, at all times relevant herein, a resident of Pedestal Gardens. On or about November 19, 2013, Nahla moved into Pedestal Gardens with her mother, Ms. Spears.

7.      TCB Pedestal Gardens LLC d/b/a Pedestal Gardens ("TCB Pedestal Gardens") is a limited liability company organized under the laws of Maryland and maintains its principal place of business in Baltimore, Maryland. At all times relevant herein, TCB Pedestal Gardens was the owner and operator of the land located at 325 McMechen Street, Baltimore, Maryland 21217, and the improvements thereon commonly known as "Pedestal Gardens."

8.      Interstate Realty Management Company ("Interstate") is a corporation organized under the laws of New Jersey, maintains its principal place of business at 3 East Stow Road, Suite 100, Marlton, New Jersey 08053, and is qualified to do business in Maryland. At all times relevant herein, Interstate Realty Management Company was contracted by TCB Pedestal Gardens to provide property management services and other related services, including maintenance and repairs at Pedestal Gardens.

9.      The Community Builders, Inc. ("Community Builders"; and together with TCB Pedestal Gardens and Interstate, the "Owner-operator Defendants") is a corporation organized under the laws of Massachusetts, maintains its principal place of business at 185 Dartmouth Street, Suite 900, Boston, Massachusetts 02116, and is qualified to do business in Maryland. At all times relevant hereto, Community Builders was the owner and managing member of TCB Pedestal Gardens.

4

10.     Alexander Security Consultants, LLC ("Alexander Security") is a limited liability company organized under the laws of Maryland and maintains its principal place of business at 12404 Lytton Avenue, Brandywine, Maryland 20613. At all times relevant hereto, Alexander Security handled business in Baltimore City, providing security services and security personnel at Pedestal Gardens pursuant to a services contract with one or more of the Owner-operator Defendants.

11.     MWR Investigations Inc. ("MWR Investigations"; and together with Alexander Security, the "Security Companies") is a corporation organized under the laws of Maryland and maintains its principal place of business at 6155 Shadywood Road, Unit 404, Elkridge, Maryland 21075. At all times relevant hereto, MWR Investigations handled business in Baltimore City, Maryland, providing security services and security personnel at Pedestal Gardens pursuant to a services contract with one or more of the Owner-operator Defendants.

### Pedestal Gardens

12.     Pedestal Gardens provided subsidized housing to predominantly women and children in need. In exchange for agreeing to provide such housing, TCB Pedestal Gardens received funds from the United State Department of Housing and Urban Development (hereinafter, "HUD") under a Housing Assistance Payments (hereinafter, "HAP") contract designed to supplement the rental payments of the Pedestal Gardens tenants.

13.     Pedestal Gardens' eligible low-income residents signed a residential lease agreement with TCB Pedestal Gardens for their particular apartment unit and the surrounding common areas and paid a portion of their income toward their rent. Additionally, on an individual basis, HUD recompensed the difference between the low-income residents' payments and the market-rate rent for the residential units within Pedestal Gardens.

14.     The HUD rental subsidies, which made Pedestal Gardens affordable to its low-income residents, remained tied to the Pedestal Gardens property and the residents' particular units. That is, if Pedestal Gardens residents wished to move from Pedestal Gardens, the HUD rental subsidy could not, and would not, follow the resident. Therefore, Pedestal Gardens residents, such as Plaintiffs, were compelled to remain at Pedestal Gardens.

15.     Pedestal Gardens has a total of 207 units, approximately 140 of which were designated as Section 8 assisted living units for low-income tenants. The Owner-operator Defendants collected tens of millions of dollars in federal subsidies in exchange for the obligation to provide decent, safe, sanitary housing to qualified low-income individuals.

16.     Under what is commonly known as the "Section 236" program, established by HUD, the Owner-operator Defendants reaped numerous financial incentives subsidized by federal tax dollars. Private lenders made forty-year market-rate loans either insured by HUD or financed by a state Housing Finance Agency to commercial landlords, such as Owner-operator Defendants. Additionally, HUD provided Owner-operator Defendants with an interest reduction payment, which allowed Owner-operator Defendants to pay an interest rate of only 1% on their mortgage loan. The Section 236 program's interest subsidies and other financial incentives aim to lower the subsidized housing project's mortgage interest rate in an attempt to lower operating costs, thereby reducing the overall rent structure for low-income tenants.

17.     As a condition of receiving HUD assistance, the federal government tasked Owner-operator Defendants with providing residents, such as the Plaintiffs, with "decent, safe, and sanitary" housing. Despite the legal obligation to maintain Pedestal Gardens in a decent, safe, and sanitary condition in exchange for millions of dollars in rental revenue, the Owner-operator Defendants delivered the opposite to the residents, including the Plaintiffs.  The Owner-

6

operator Defendants allowed the Pedestal Gardens units and surrounding common areas to deteriorate horrifically, rendering Pedestal Gardens unsafe and unfit for human habitation.

18.     Ms. Spears lived in the apartment unit located at 1512 Eutaw Place, Apartment A-2 within Pedestal Gardens since November of 2013, with her two daughters, Gabrielle (age 16 years), and Nahla (age 6 years). Ms. Spears' apartment was located in the basement of the building in a secluded corner of the apartment complex.

19.     Plaintiffs' apartment unit and Pedestal Gardens suffered from numerous dangerous conditions and defects.

20.     The plumbing in Plaintiffs' residential unit at Pedestal Gardens was broken, causing mold, mildew and other bacteria to grow. Water leaks caused pools of standing water on the floors.

21.     Plaintiffs' unit was overrun with rodents and insects. The Plaintiffs routinely spotted bedbugs, mice, rats, water bugs, cockroaches, ants, spiders, and termites on the premises and in their unit. The rodents and insects burrowed through doors, floors, baseboards, windows, electrical panels, and gaps in the walls or ceilings, damaging or destroying Plaintiffs' food, furniture, clothes, and other personal belongings. Infestations also caused or contributed to injuries such as bites and respiratory illnesses, mental anguish, pain, suffering, anxiety, depression and sleeplessness.

22.     Plaintiffs also lived in a unit with damaged doors, windows, locks, light fixtures, floor tiles, walls and ceilings, thereby presenting a substantial risk of serious personal injury and/or death.

23.    Owner-operator Defendants delayed or declined Plaintiffs' complaints and repair requests. When Owner-operator Defendants did make repairs, the repairs were either inadequate or poorly performed.

24.    Paragraph 10 of Plaintiffs' lease agreement states as follows:

**Maintenance:**
(a) The Landlord agrees to:
    (1) regularly clean all common areas of the project;
    (2) maintain the common areas and facilities in a safe condition;
    (3) arrange for collection and removal of trash and garbage;
    (4) maintain all equipment and appliances in safe and working order;
    (5) make necessary repairs with reasonable promptness;
    (6) maintain exterior lighting in good working order;
    (7) provide extermination services, as necessary; and
    (8) maintain grounds and shrubs.

*See* **Exhibit 1** attached hereto.

25.    Pedestal Gardens experienced a systemic, property-wide maintenance failure. Specifically, the Owner-operator Defendants failed to perform adequate, scheduled, preventative maintenance to the housing units and exterior grounds. As a result, the units were plagued with mold, mildew, and other bacterial growth. Additionally, trash, debris and hazardous waste, including pools of urine and contaminated drug paraphernalia, saturated the hallways and corridors. The common areas of Pedestal Gardens contained broken light fixtures, doors, windows, and locks thereby presenting a substantial risk of serious personal injury and/or death.

26.    Owner-operator Defendants contracted for and retained unidentified individuals to perform security-related functions at Pedestal Gardens (individually and collectively, the "Unidentified Security Officers; and together with the Security Companies, the "Security Defendants"). Unidentified Security Officers were responsible for maintaining safe and habitable housing for all of Pedestal Gardens' residents. Unidentified Security Officers, however,

deliberately and negligently refused to address the abject and deplorable conditions at Pedestal Gardens.

27.     Security Defendants promised Pedestal Gardens residents, including Plaintiffs, 24-hour security of the premises. However, they failed to deliver on this promise.

28.     Worse still, violent crime and other criminal activity plagued Pedestal Gardens.

29.     In 2003 and beyond, management of Pedestal Gardens employed special police officers in an attempt to provide capable security to residents after receiving their commission from the Baltimore City Police Commissioner's Office and/or State of Maryland as sworn officers.

30.     In February of 2016, Security Defendants permitted a group of nonresidents to film a music video in a second-floor vestibule at Pedestal Gardens. The individuals blasted loud music and openly wielded firearms until a teenager accidentally shot and killed himself.  Many Pedestal Gardens residents, including children, witnessed the teenager's lifeless body in the complex.[2]

31.     Although Defendants knew that violent crime and drug activity routinely occurred on the Pedestal Gardens premises and threatened the safety of the residents, Defendants failed to provide adequate security and instead hired unqualified and ineffective security officers who blatantly contravened the rights and freedoms protected by the Maryland State and United States Constitutions.

32.     Security Defendants ignored the criminal activity within Pedestal Gardens.

33.     Residents, including Plaintiffs, complained to Unidentified Security Officers to remove loiterers and prevent illegal activity from occurring at Pedestal Gardens. Despite their

---

[2] http://www.wbaltv.com/article/16-year-old-boy-dies-from-gunshot-wounds/7098604; http://www.baltimoresun.com/news/maryland/crime/

complaints, Unidentified Security Officers failed to take enforcement or corrective action to remove loiterers from the premises, stop the sale and use of illegal drugs, and prevent burglaries, robberies, assaults, and other crimes from occurring at Pedestal Gardens.

34.    Pedestal Gardens used a card access system to restrict non-residents from entering the premises. Management at Pedestal Gardens provided each new resident with an access card, which restricted entry to the courtyards and doorways of the residential units. However, sometime in 2014, the access card system stopped working and management failed to repair the system despite numerous complaints from residents. As a result, the gates leading to the Pedestal Gardens courtyard were wide open at all times, permitting unrestricted access to the premises. This also meant that the doors leading into the Pedestal Gardens residential units were no longer locked and secured, thereby giving anyone free access to the hallways and corridors of the residential buildings. Additionally, lights in the hallways and corridors of the complex were typically broken. This provided concealment for gang activity and thus presented a substantial risk of serious personal injury and/or death to Pedestal Gardens' residents. This breakdown in security was reported to Owner-operator Defendants or their agents or employees by Plaintiffs and several other concerned residents with no response.

35.    The unfettered level of access to Pedestal Gardens allowed the halls and common areas of Pedestal Gardens to be controlled by gang members, such as the Lor Black Gang, which operated with impunity at Pedestal Gardens. In fact, Baltimore's "number one trigger-puller", a Black Guerilla Family member, was reported by Baltimore City Police to have "terrorized" the community of Pedestal Gardens without interference from Security Defendants until he was finally apprehended in 2016.[3] Whether due to intimidation, or compensation for their inaction,

_____

[3] http://baltimore.cbslocal.com/2016/08/22/baltimores-number-one-trigger-puller-arrested/

10

security personnel at Pedestal Gardens turned a blind eye to the activities of the Lor Black Gang and allowed gang members and drug dealers to enjoy complete control over Pedestal Gardens and its residents.

36.     Gang members and other nonresidents sold narcotics on the premises and robbed and assaulted residents and their visitors. Security Defendants would either turn a blind eye to the criminal activity occurring at Pedestal Gardens or explicitly authorize the criminal activity. Wrongdoers also openly carried guns, drank alcohol and smoked marijuana in the halls and common areas of the complex and participated in other illegal activities at Pedestal Gardens. Drug dealers were even permitted to utilize the security offices at Pedestal Gardens as "stash" locations to avoid having large quantities of drugs on their person as they operated within the premises.

37.     Plaintiffs were repeatedly assaulted, harassed and stalked while living in Pedestal Gardens. Although Plaintiffs told Defendants about the verbal and physical assaults, Defendants did nothing.

38.     Security Defendants also were complicit in burglaries occurring at Pedestal Gardens. Security officers would give their keys to burglars to steal property belonging to residents, and, in return, the burglars would give the security officers a portion of the stolen property.

39.     On one occasion, a group of children were playing basketball when an adult threatened to "shoot everybody." Security officers failed to respond to the threat, even though they were notified.

40.     Ms. Spears and her daughters lived in dangerous conditions unsafe for human habitation, including but not limited to, mold and mildew, rodent and insect infestation, and

11

flawed and defective interior fixtures. Although Ms. Spears routinely complained to management about the broken plumbing in her apartment, the issue was not addressed by Owner-operator Defendants, resulting in pools of standing water on the floors of her apartment.

41.     Plaintiffs' apartment unit at Pedestal Gardens was a focal point for gang activity. The complex was controlled by drug dealers who threatened and harassed Plaintiffs to remain silent about their dealings within the premises. In fact, drug dealers and members of the Lor Black Gang were so dominant that security personnel refused to confront them, thereby leaving Plaintiffs completely defenseless.

42.     Rather than addressing the gang members, drug dealers and other wrongdoers, Defendants told Ms. Spears to either stay inside of her apartment or move out of Pedestal Gardens when she voiced her concerns. Shortly after pleading for more protection, retaliatory harassment and incidents of violence towards Ms. Spears and her daughters escalated. Ms. Spears was verbally harassed and threated with bodily harm. Eggs and liquor were thrown on her as she walked through the complex. Ms. Spears and her daughters were assaulted on multiple occasions by individuals who supported the drug and gang activity at Pedestal Gardens. Gang members and other wrongdoers assaulted and harassed Gabrielle daily on her way home from school. In an effort to further intimidate Plaintiffs, gang members and drug dealers frequently videotaped Ms. Spears, causing her to fear an impeding attack.

43.     Defendants harassed and threatened Ms. Spears, Gabrielle and Nahla. Gabrielle and Nahla were afraid to play outside and to leave their home for fear of enduring attacks and threatening behavior by Defendants.

44.     Fearing an attack, Ms. Spears once again contacted maintenance and security personnel. Rather than confront the wrongdoers or even fix the faulty locks in her apartment unit, maintenance put flimsy wooden sticks on Ms. Spears' window to serve as an additional barrier.

45.     On September 11, 2016, the concerns that Ms. Spears had voiced numerous times to Security Defendants regarding the deplorable and dangerous conditions at Pedestal Gardens tragically manifested.  Earlier that night, Ms. Spears had a few guests over her apartment for a get-together.  Once the gathering ended and guests had left, Ms. Spears put her youngest child, Nahla, to bed and went to bed herself. Once asleep, three men, unimpeded by any security personnel, broke in to Ms. Spears' apartment and raped her. Tragically, Ms. Spears' eldest daughter, Gabrielle, could hear the attack taking place from outside Ms. Spears' bedroom.

46.     Ms. Spears noticed that the wooden sticks placed on her window for protection by Defendants were broken by the perpetrators of the rape to gain entry into her apartment unit.  She also noticed that the words "Lor Black Gang" were spray painted on the wall outside of her unit.

47.     After the assault and to protect her family, Ms. Spears often required Gabrielle and Nahla to stay inside their home.

48.     As a result of the above described incident, Plaintiffs suffered from severe anxiety, insomnia, depression, and other mental health illnesses.

49.     After the rape, Defendants continued to allow Plaintiffs to be assaulted, harassed, and stalked without intervention.

50.     Fearing for her safety and the safety of her children, Ms. Spears moved out of Pedestal Gardens on or about November 10, 2016. She never received her security deposit or a refund for her November 2016 rent less the prorated amount.

INTENTIONALLY LEFT BLANK

13

## CAUSES OF ACTION

### COUNT I

**Violation of Article 24 of Maryland Declaration of Rights (Equal Protection)
Plaintiffs Against All Defendants**

51.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

52.    Acting under the color of law, Security Defendants applied the disorderly conduct, loitering, and/or trespass laws in a discriminatory and race-based manner by focusing on Pedestal Gardens' residents and visitors, most of whom identify as African American. Security Defendants abused the special police powers and security officer powers conferred on them by, among other ways, harassing, stopping, questioning, physically restraining, detaining, and/or arresting Plaintiffs without probable cause or reasonable suspicion to believe that they had committed a crime.  In essence, the Security Defendants rendered the Plaintiffs prisoners in their own home.

53.    Security Defendants acted intentionally and with deliberate indifference to Plaintiffs' constitutional rights, and demonstrated ill will, improper motive, or evil purpose. Defendants deprived Plaintiffs of their constitutionally protected right to equal protection of the law.

54.    As a result of Security Defendants' actions, Plaintiffs suffered severe damages, including but not limited to physical injuries, severe mental anguish, humiliation, disgrace, and loss of dignity, as well as monetary losses for lost wages, legal fees, and other costs and expenses.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

14

A. Enter judgment in favor of Plaintiffs and against Defendants finding Defendants liable to Plaintiffs;

B. Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C. Award punitive damages;

D. Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

E. Award the costs and expenses of this case, including attorneys' fees;

F. Award pre-judgement and post-judgement interest; and

G. Award all other further and general relief as the court deems just and necessary.

## COUNT II

**Violation of Maryland Declaration of Rights Article 24 (Due Process)**
**Plaintiffs Against All Defendants**

55.     Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

56.     Acting under the color of law, Security Defendants applied the disorderly conduct, loitering, and/or trespass laws in a manner that interfered with the freedom of movement and freedom of association of Pedestal Gardens' residents and visitors without affording them sufficient procedural safeguards.  Security Defendants abused the special police powers and security officer powers conferred on them by, among other ways, harassing, stopping, questioning, physically restraining, detaining, and/or arresting Plaintiffs and other Pedestal Gardens residents and visitors without probable cause or reasonable suspicion to believe that they had committed a crime.

15

57.     Security Defendants acted intentionally and acted with deliberate indifference to Plaintiffs' constitutional rights, and demonstrated ill will, improper motive, or evil purpose. Defendants' actions deprived Plaintiffs of their constitutionally protected liberty and/or property interests without affording them due process.

58.     As a result of Security Defendants' actions, Plaintiffs suffered severe damages, including but not limited to physical injuries, severe mental anguish, humiliation, disgrace, and loss of dignity, as well as monetary losses for lost wages, legal fees, and other costs and expenses.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A.   Enter judgment in favor of Plaintiffs and against Defendants finding Defendants liable to Plaintiffs;

B.   Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C.   Award punitive damages;

D.   Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

E.   Award the costs and expenses of this case, including attorneys' fees;

F.   Award pre-judgement and post-judgement interest; and

G.   Award all other further and general relief as the court deems just and necessary.

## COUNT III

### Pattern or Practice of Constitutional Violations
### Plaintiffs Against All Defendants

59.     Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

60.     Acting under the color of law, Security Defendants engaged in a pattern and practice of constitutional violations by conducting unlawful and unconstitutional stops and/or arrests in Pedestal Gardens in lieu of implementing and enforcing `safety and security protocols. Security Defendants violated Plaintiffs' constitutional rights by stopping, questioning, detaining, and/or arresting Plaintiffs and other Pedestal Gardens residents and visitors without probable cause or reasonable suspicion to believe that they had committed a crime.  Because Security Defendants' discriminatory and unlawful conduct continued and persisted during the time period covered by this lawsuit, Plaintiffs are entitled to application of the continuing violation doctrine to all violations alleged herein.

61.     As a result of Security Defendants' actions, Plaintiffs suffered severe damages, including but not limited to physical injuries, severe mental anguish, humiliation, disgrace, and loss of dignity, as well as monetary losses for lost wages, legal fees, and other costs and expenses.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A. Enter judgment in favor of Plaintiffs and against Defendants finding Defendants liable to Plaintiffs;

17

B.  Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C.  Award punitive damages;

D.  Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

E.  Award the costs and expenses of this case, including attorneys' fees;

F.  Award pre-judgement and post-judgement interest; and

G.  Award all other further and general relief as the court deems just and necessary.

## COUNT IV

### Battery
### Plaintiffs Against All Defendants

62.  Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

63.  On multiple occasions, Unidentified Security Officers intentionally and deliberately touched Plaintiffs.  For example, Unidentified Security Officers threw eggs at Plaintiffs and poured liquor on them.

64.  Unidentified Security Officers intentionally touched Plaintiffs deliberately and without their consent and did so with actual malice.

65.  The malicious, savage, and brutal conduct inflicted on Plaintiffs by Unidentified Security Officers was blatant and egregious enough to offend a person's reasonable sense of personal dignity and lacking any moral dignity whatsoever.

66.  As a result of Unidentified Security Officers' actions, Plaintiffs suffered substantial injuries, including but limited to physical injuries, pain and suffering, severe mental

18

anguish, humiliation, disgrace, and loss of dignity, as well as monetary losses for medical and related expenses, lost wages, and other costs and expenses.  Unidentified Security Officers were acting within the scope of their employment, and their employer had control over their hiring, work, schedule, credentialing, and performance of their professional duties.  Furthermore, given that these acts were carried out by Unidentified Security Officers while wearing uniforms and identifying clothing leading Plaintiffs to believe that they were acting as agents of the corporate Defendants, Unidentified Security Officers exerted apparent authority to act as agents of their principal. Therefore, the Security Companies and Owner-operator Defendants are vicariously liable for their conduct.

67.    In addition, Owner-operator Defendants failed to respond to Plaintiffs' concerns regarding inadequate security. Despite numerous complaints to Owner-operator Defendants that Security Defendants were not performing or inadequately performed security-related functions, Owner-operator Defendants did nothing.

68.    Moreover, Owner-operator Defendants failed to repair dangerous and defective conditions in Plaintiffs' apartment unit. Owner-operator Defendants failed to repair Plaintiffs' broken locks, doors, and windows. As a result of the Owner-operator Defendants' failings, assailants were able to gain access to Plaintiffs' apartment unit and rape Ms. Spears.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A. Enter judgment in favor of Plaintiffs and against Defendants finding Defendants liable to Plaintiffs;

B. Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C. Award punitive damages;

D. Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

E. Award the costs and expenses of this case, including attorneys' fees;

F. Award pre-judgement and post-judgement interest; and

G. Award all other further and general relief as the court deems just and necessary.

## COUNT V

### Negligence
### Plaintiffs Against Owner-Operator Defendants

69.     Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

70.     In connection with the leasing of units at Pedestal Gardens, Owner-operator Defendants held themselves out, and permitted themselves to be held out by others, as expert owners, managers, and lessors of multifamily residential properties with expertise in owning, operating, controlling, managing, maintaining, and repairing multifamily residential properties.

71.     At all times relevant hereto, Owner-operator Defendants knew they were owning, operating, controlling managing, maintain, and repairing a multifamily residential property of which its units were to be leased to consumers for residential, family purposes.  In fact, many lease agreements were negotiated and made prior to inspection, walk-thru, and/or visitation to Pedestal Gardens.  Thus, Owner-operator Defendants intended and could foresee that Plaintiffs, who leased a unit at Pedestal Gardens, would be relying upon the Owner-operator Defendants to own, operate, control, manage, maintain, and repair Pedestal Gardens with the skill and care required of experts in their field.

20

72.     Owner-operator Defendants knew, or with the exercise of reasonable care should have known, Plaintiffs' individual unit, and thus Plaintiffs, would suffer damage if Pedestal Gardens was not owned, operated, controlled, managed, maintained, and/or repaired with the ordinary and reasonable care and skill required of multifamily property owners, developers, and/or management companies within the industry.

73.     Owner-operator Defendants, by and through their principals, agents, servants, and employees, participated in, cooperated in, supervised, directed, inspected and/or approved the operation, maintenance, upkeep, and repair of Pedestal Gardens and participated in developing, operating, maintaining, repairing, finishing, directing, overseeing, supervising, inspecting, and/or approving the improper, deficient, and defective maintenance and repairs of Pedestal Gardens.

74.     Owner-operator Defendants further had a duty of care to maintain Pedestal Gardens in an appropriate manner and in accordance with promises, building codes, statutes, ordinances, codes, industry standards, in a good and workmanlike manner, and other applicable guidelines.

75.     By their acts and omissions which resulted in Plaintiffs residing at Pedestal Gardens without heat, without air conditioning, and from various other housing code violations, Owner-operator Defendants violated statutes designed to protect Maryland and/or Baltimore City residents, including Plaintiffs.

76.     The Maryland and/or Baltimore City statutes violated by Defendants include, but are not limited to, The Baltimore City Housing Code, The International Property Maintenance Code and regulations issued thereunder, constituting negligence for violations of statutes.

77.     Section 1001 of the Baltimore City Housing Code provides: "No owner shall lease . . . any vacated . . . dwelling or dwelling unit which does not comply with the provisions of this Code. . . ."

78.     Section 1001 of the Baltimore City Housing Code provides: "No owner shall lease … any vacated … dwelling or dwelling unit which does not comply with the provisions of this Code…."

79.     Section 310(a)(1) of the Baltimore City Housing Code provides: "Any person who is either an owner or operator of a property subject to this Code shall be responsible for compliance with all of the provisions of the Code."[4]

80.     Ordinances 15-547, and Last Amended by Ordinances 16-581, 17-015 and 17-017 titled Building, Fire, and Related Codes of Baltimore City 2015 edition ("BFRBC"), adopt the International Property Maintenance Code ("IPMC") into the Baltimore City Housing Code. Section 101.4.5 of the BFRBC provides: "The International Property Maintenance Code (2015 Edition), as modified in Part VII of this Code, applies to existing structures and premises; equipment and facilities; light, ventilation, space heating, sanitation, life, and fire safety hazards; responsibilities of owners, operators, and occupants; and occupancy of existing premises and structures."

81.     Section 601.2 of the IPMC provides: "The owner of a structure shall provide and maintain mechanical and electrical facilities and equipment in compliance with these

---

[4] "Owner" is defined in § 105(jj) of the Baltimore City Housing Code as "any person … who … owns, holds, or controls … title to any dwelling … with or without accompanying actual possession thereof…." The Baltimore City Housing Code defines "operator" in § 105(hh) as "any person who has charge, care, or control of a building … in which dwelling units … are let or offered for occupancy…."

22

requirements. A person shall not occupy as owner-occupant or permit another person to occupy any premises which does not comply with the requirements of this chapter."

82.     Section 602.2 of the IPMC provides: "Dwellings shall be provided with heating facilities capable of maintaining a room temperature of 68°F (20°C) in all habitable rooms, bathrooms and toilet rooms ...."

83.     Owner-operator Defendants, by and through their principals, agents, and employees allegedly undertook certain repair work in a purported attempt to correct certain defects and deficiencies in the maintenance, design and construction of Pedestal Gardens.

84.     Owner-operator Defendants, as alleged heretofore, owed a duty to Plaintiffs to undertake such repair work with due care and in a workmanlike manner in accordance with the applicable building code, statutes, laws, regulations, industry standards, proper engineering and construction practices, and other requirements. Owner-operator Defendants breached this duty and were negligent by failing to perform the necessary repair work and/or by performing inadequate and improper repairs which did not address the underlying maintenance requirements/obligations and/or deficiencies at Pedestal Gardens, and which in some cases exacerbated or accelerated said deficiencies and damages resulting therefrom.

85.     Owner-operator Defendants failed to discharge their duty of care by, among other things, a) ignoring Plaintiffs' requests for repairs; b) performing inadequate maintenance at Pedestal Gardens, including within Plaintiffs' dwelling units; c) failing to perform maintenance in a good and workmanlike manner, in accordance with applicable codes, statutes, laws, regulations and industry standards; d) failing to properly supervise, oversee, direct, and/or inspect the maintenance and repairs of Pedestal Gardens; e) failing to properly repair defective conditions at Pedestal Gardens; f) using faulty, improper and defective materials in the maintenance and repair of

Pedestal Gardens; and/or g) being otherwise negligent in maintaining, repairing supervising, directing, inspecting, overseeing and approving maintenance and repairs at Pedestal Gardens.

86.     Plaintiffs did not know that Pedestal Gardens contained maintenance and repair problems, code violations, deviations from applicable building codes, statutes, laws, industry standards, and/or regulations, nor were they aware of its inherently dangerous and defective condition at the time they entered into their lease and/or took control of their dwelling unit and/or commercial unit. Moreover, Plaintiffs would not and could not have discovered such defects and deficiencies by reasonable inspections at those times.

87.     In violating these statutes, Owner-operator Defendants failed to provide safe and habitable housing, failed to obey codes and/or statutes designed to protect Maryland and/or Baltimore City residents and commercial tenants, including Plaintiffs, and caused Plaintiffs to be forced to reside at Pedestal Gardens suffering from the conditions as described above and below.

88.     Owner-operator Defendants' violations of law directly and/or proximately caused damage to Plaintiffs in the form of lost rent, bodily and psychic injuries, suffer severe mental anguish, sleeplessness, humiliation, pain and suffering, physical impairment, diminished and altered quality of life, property damage and other injuries, for which Owner-operator Defendants are liable.

89.     As a direct and proximate result of the negligent and careless conduct of Owner-operator Defendants, and without any negligence on the part of Plaintiffs contributing thereto, Pedestal Gardens as designed and built, creates an unreasonable and serious risk of personal injury, and has resulted in personal injury, property damage, and other damages and injuries described above and below.

24

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

    A. Enter judgment in favor of Plaintiffs and against Owner-operator Defendants, jointly and severally, finding Owner-operator Defendants liable to Plaintiffs;

    B. Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

    C. Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

    D. Award the costs and expenses of this case, including attorneys' fees;

    E. Award pre-judgement and post-judgement interest; and

    F. Award all other further and general relief as the court deems just and necessary.

## COUNT VI

### Negligence
### Plaintiffs Against Security Defendants

90.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

91.    Security Defendants had a duty of care to exercise its security services on the Pedestal Gardens property in an appropriate manner. Specifically, Security Defendants had a duty to identify and monitor guests visiting Pedestal Gardens and implement measures to employ a properly trained security team.

92.    Security Defendants breached these duties of care by, among other ways, failing to implement and enforce reasonable security measures, guidelines and protocols so as to prevent bodily injuries from occurring and by harassing, stopping, questioning, physically restraining

detaining and/or arresting Plaintiffs without a reasonable basis to believe they had committed a crime.

93.     Furthermore, Security Defendants failed to implement and enforce standards, guidelines and protocols for investigating illegal activity occurring on the property.  Security Defendants also failed to address Plaintiffs' concerns regarding illegal activity occurring on the premises.

94.     Security Defendants' negligence proximately caused Plaintiffs to suffer injuries. All such injuries were caused solely by the negligence of Security Defendants without any negligence by Plaintiffs.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A. Enter judgment in favor of Plaintiffs and against Security Defendants, jointly and severally, finding Security Defendants liable to Plaintiffs;

B. Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C. Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

D. Award the costs and expenses of this case, including attorneys' fees;

E. Award pre-judgement and post-judgement interest; and

F. Award all other further and general relief as the court deems just and necessary.

## COUNT VII

### Negligent Hiring, Supervision, Training, and Retention
### Plaintiffs Against All Defendants

95.     Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

96.     Defendants had a duty to use reasonable care to select and retain individuals who were competent and fit to perform the duties of a security officer.

97.     Defendants had actual knowledge that the security guards were unfit for their assigned duties because they unlawfully and unconstitutionally stopped, detained, and arrested people in the Pedestal Gardens community.  Moreover, Defendants repeatedly ignored concerns that security officers were harassing, assaulting, and battering Plaintiffs and that the security officers permitted illegal activity to be conducted at Pedestal Gardens. In addition, Defendants ignored complaints and other indications that the security guards, were unfit for their assigned duties. A reasonably prudent property owner/manager and employer would not have ignored indications that its security officers were unfit for their duties.

98.     Defendants knew or should have known that the security officers, including Unidentified Security Officers, would continue to interact with members of the public, current residents, former residents, prospective residents and Plaintiffs.

99.     Plaintiffs are members of the public who would foreseeably come into contact with the security officers.  Therefore, Defendant sowed a duty of care to Plaintiffs, and such duty was breached.

100.    As a result of Defendants' negligence in hiring, supervising, training, and retaining Unidentified Security Officers, as security officers at Pedestal Gardens, Plaintiffs were injured as alleged.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

    A.  Enter judgment in favor of Plaintiffs and against Defendants, jointly and severally, finding Defendants liable to Plaintiffs;

    B.  Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

    C.  Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

    D.  Award the costs and expenses of this case, including attorneys' fees;

    E.  Award pre-judgement and post-judgement interest; and

    F.  Award all other further and general relief as the court deems just and necessary.

### COUNT VIII

**Breach of Lease Agreement**
**Plaintiffs Against TCB Pedestal Gardens**

101.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

102.    Plaintiffs entered into a lease with TCB Pedestal Gardens for their apartment unit at Pedestal Gardens pursuant to their lease agreement.

103.    Plaintiffs had a lease agreement in place with TCB Pedestal Gardens, whereby Plaintiffs would tender monthly rent payments to TCB Pedestal Gardens, and in return, TCB Pedestal Gardens would provide a habitable residence. *See* **Exhibit 1**. The lease agreement sets forth contractual obligations for TCB Pedestal Garden, which included, but were not limited to, to regularly clean all common areas of Pedestal Gardens, maintain the common areas and

facilities in a safe condition, arrange for collection and removal of trash and garbage, maintain all equipment and appliances in safe and working order, make necessary repairs with reasonable promptness, maintain exterior lighting in good working order, provide extermination service, as necessary, and maintain grounds and shrubs.

104.    Plaintiffs did tender monthly rental payments to TCB Pedestal Gardens. Additionally, TCB Pedestal Gardens received federally subsidized funds allocated by HUD pursuant to the HAP program to provide decent, safe, and sanitary homes for Plaintiffs.

105.    TCB Pedestal Gardens materially breached the lease agreement in place with Plaintiffs by failing to provide a residence that was habitable and/or decent, safe, and sanitary. Rather, the Plaintiffs' unit and the Pedestal Gardens property generally suffered from numerous defects and dangerous conditions described above.

106.    As a result of TCB Pedestal Gardens' breach, Plaintiffs suffered serious harm as more thoroughly described above.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A.   Enter judgment in favor of Plaintiffs and against TCB Pedestal Gardens finding TCB Pedestal Gardens liable to Plaintiffs;

B.   Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C.   Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

D.   Award the costs and expenses of this case, including attorneys' fees;

E.   Award pre-judgement and post-judgement interest; and

F.   Award all other further and general relief as the court deems just and necessary.

## COUNT IX

### Breach of Implied Warranty of Habitability
### Plaintiffs Against TCB Pedestal Gardens

107.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

108.   Plaintiffs resided in a residential unit located within Pedestal Gardens.

109.   Pursuant to separate written lease agreements entered into on various dates that included automatic renewal provisions, Plaintiffs leased from TCB Pedestal Gardens a residential unit at Pedestal Gardens in exchange for rental payments payable monthly. *See* **Exhibit 1**.

110.   Plaintiffs entered into possession of the premises pursuant to the lease between Plaintiffs and TCB Pedestal Gardens.

111.   At the time  TCB Pedestal Gardens rented the premises to Plaintiffs, the premises were unfit for human habitation in that they substantially failed to comply with the Baltimore City Housing Code and/or the Building, Fire and Related Codes of Baltimore City, as amended, which are designed to protect a tenant's health and safety.

112.   Specifically, at the time Plaintiffs took possession, the premises were uninhabitable and unfit for human occupation in that they suffered from numerous defects and dangerous conditions as described above. Notably, Pedestal Gardens was infected with mold, mildew and other bacteria, as well as bedbugs, mice, rats, water bugs, cockroaches, ants, spiders, and termites. Additionally, trash, debris and hazardous waste, including pools of urine and contaminated drug paraphernalia, saturated the hallways and corridors. Plaintiffs also lived in a

30

unit with damaged doors, windows, locks, light fixtures, floor tiles, walls and ceilings. None of these conditions was known to Plaintiffs prior to or at the time Plaintiffs moved into the premises.

113.    Plaintiffs repeatedly notified Owner-operator Defendants, both orally and in writing, of the dangerous conditions of the premises, and requested that TCB Pedestal Gardens have them repaired, but TCB Pedestal Gardens refused to repair them.

114.    Plaintiffs paid TCB Pedestal Gardens rent per month for each month or part of a month that Plaintiffs occupied the premises.

115.    The reasonable rental value of the premises was far less than the value charged and collected by TCB Pedestal Gardens from Plaintiffs due to the defective and dangerous condition of the premises.

116.    As a proximate result of TCB Pedestal Gardens' breach of the implied warranty of habitability and TCB Pedestal Gardens' failure to repair the defective and dangerous conditions or to have them repaired, Plaintiffs sustained injuries.

117.    As a further proximate result of TCB Pedestal Gardens' breach of the implied warranty of habitability and failure to repair the defective and dangerous conditions or to have them repaired, Plaintiffs suffered property damage and economic loss, including, but not limited to, items of personal property.

118.    As a further proximate result of  TCB Pedestal Gardens' breach of the implied warranty of habitability and failure to repair the defective and dangerous condition or to have them repaired, Plaintiffs suffered discomfort and annoyance, all to Plaintiffs' general damage.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A. Enter judgment in favor of Plaintiffs and against TCB Pedestal Gardens finding TCB Pedestal Gardens liable to Plaintiffs;

B. Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C. Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

D. Award the costs and expenses of this case, including attorneys' fees;

E. Award pre-judgement and post-judgement interest; and

F. Award all other further and general relief as the court deems just and necessary.

## COUNT X

### Intentional Misrepresentation and Fraud
### Plaintiffs Against All Defendants

119.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

120.   Owner-operator Defendants were sophisticated property owners and managers.

121.   Plaintiffs agreed to occupy their unit at Pedestal Gardens upon the belief that Owner-operator Defendants would provide a safe unit fit for human habitation. Specifically, Owner-operator Defendants promised to properly maintain and repair Plaintiffs' unit.

122.   Owner-operator Defendants also told Plaintiffs that their unit posed no risk to health or human safety.

123.   Moreover, Owner-operator Defendants promised to fix the defective and dangerous conditions located on the premises. Owner-operator Defendants told Plaintiffs that

they had repaired the dangerous concerns and conditions outlined above, when, in fact, they had not.

124.    Defendants promised Plaintiffs that 24-hour security would be provided at Pedestal Gardens and that the security officers would patrol the premises and respond to residents' concerns regarding crime and illegal activity occurring at Pedestal Gardens.

125.    Owner-operator Defendants falsely and fraudulently represented that Plaintiffs' residential unit in Pedestal Gardens was safe for human habitation and was properly maintained and repaired.  Defendants falsely and fraudulently represented that the premises were safe for human habitation and that they would respond to Plaintiffs' concerns regarding their safety.

126.    Defendants knew that their statements regarding the safety, maintenance and repair of Plaintiffs' residential unit and the premises were false at the time they made them. Defendants, at the time Plaintiffs entered into their lease agreement, were acutely aware of the health hazards and safety hazards posed by the premises, including the defective and dangerous conditions described above, yet knowingly made affirmative statements to the contrary to the Plaintiffs.

127.    Moreover, Defendants concealed the defective and dangerous conditions described above by, among other things, performing only patchwork repairs or inadequate solutions in response to Plaintiffs' concerns.

128.    Defendants knew that the security officers were not performing their duties yet represented to Plaintiffs that they were.  When Plaintiffs complained to Defendants, Defendants threatened them and physically and verbally assaulted them.

129.    The intent of Defendants in making the fraudulent statements regarding the safety and condition of Pedestal Gardens was to defraud Plaintiffs and induce them into entering a lease agreement for an apartment unit, for which Defendants reaped substantial monetary benefit.

130.    Plaintiffs justifiably relied on Defendants' statements that Pedestal Gardens was safe for habitation, properly maintained and repaired, and posed no risk to the Plaintiffs' health or safety. Were it not for Defendants' intentionally fraudulent statements, Plaintiffs would not have entered into a lease agreement to rent the unit, let alone moved into that property.

131.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered severe injuries.

132.    Defendants' conduct, as described herein, evidences recklessness, evil motive, intent to injure, ill will, and fraud, and constitutes actual malice.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A.  Enter judgment in favor of Plaintiffs and against Defendants finding Defendants liable to Plaintiffs;

B.  Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C.  Award punitive damages

D.  Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

E.  Award the costs and expenses of this case, including attorneys' fees;

F.  Award pre-judgement and post-judgement interest; and

34

G.  Award all other further and general relief as the court deems just and necessary.

## COUNT XI

### Conspiracy Through Fraud and Intentional Misrepresentation
### Plaintiffs Against All Defendants

133.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

134.   Defendants agreed or had an understanding that they would induce Plaintiffs to rent a residential unit within Pedestal Gardens by falsely stating that the property was fit for human habitation and was properly maintained and repaired.

135.   Defendants agreed or had an understanding to engage in the unlawful practices described above in order to induce Plaintiffs to rent a residential unit to increase their profits.

136.   In furtherance of Defendants' conspiracy, Defendants participated in the intentional misrepresentation as more thoroughly described above. Moreover, when confronted with instances of the defective and dangerous conditions described above, the Defendants did conspire for the unlawful purpose of telling the Plaintiffs that the property was safe.

137.   Essentially, Defendants coordinated their efforts, shared information, and planned together to misrepresent the conditions at Pedestal Gardens to the Plaintiffs in order to maximize occupancy, thereby making more profit.

138.   As a result of Defendants' behavior, Plaintiffs suffered severe injuries, including but not limited to severe mental anguish, humiliation, disgrace, loss of dignity, and other injuries.

139.   Defendants' conduct, as described herein, evidences recklessness, evil motive, intent to injure, ill will, and fraud, and constitutes actual malice.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A.  Enter judgment in favor of Plaintiffs and against Defendants finding Defendants liable to Plaintiffs;

B.  Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C.  Award punitive damages

D.  Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

E.  Award the costs and expenses of this case, including attorneys' fees;

F.  Award pre-judgement and post-judgement interest; and

G.  Award all other further and general relief as the court deems just and necessary.

## COUNT XII

**Premises Liability**
**Plaintiffs Against Owner-operator Defendants**

140.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

141.   Owner-operator Defendants retained control over the halls, stairways, and other portions of Pedestal Gardens used in common by all tenants.

142.   Owner-operator Defendants had a duty to use reasonable care to inform Plaintiffs that the Pedestal Gardens property generally, and the common areas in particular, contained defective and dangerous conditions and was unsafe, uninhabitable, and unfit for human habitation.

143.   Owner-operator Defendants breached the duty to use reasonable care by failing to inform Plaintiffs that the Pedestal Gardens property generally, and the common areas in

36

particular, suffered from numerous defects and dangerous conditions described above, including, but not limited to, trash, debris, hazardous waste, and drug paraphernalia in the hallways, a broken card access system controlling entry into Pedestal Gardens, broken locks, windows, and light fixtures, violations of the Baltimore City Housing Code and/or the building, fire and related codes of Baltimore City, and the failure to correct said defects. Owner-operator Defendants further breached the duty of reasonable care by failing to inform Plaintiffs of the dangerous and objectionable provision of security services on the Pedestal Gardens property described above.

144.    None of these conditions were known to Plaintiffs prior to or at the time Plaintiffs moved into the premises.

145.    But for the Owner-operator Defendants' breach of their duty of care, the injuries to Plaintiffs would not have occurred. Further, it was reasonably foreseeable that Owner-operator Defendants' breach of their duties of care would cause the injuries suffered by Plaintiffs.

146.    As a direct and proximate result of Owner-operator Defendants' conduct, Plaintiffs suffered severe damages.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A. Enter judgment in favor of Plaintiffs and against Owner-operator Defendants finding Owner-operator Defendants liable to Plaintiffs;

B. Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C. Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

37

D.  Award the costs and expenses of this case, including attorneys' fees;

E.  Award pre-judgement and post-judgement interest; and

F.  Award all other further and general relief as the court deems just and necessary.

## COUNT XIII

### Breach of Express Warranty of Habitability
### Plaintiffs Against Defendant TCB Pedestal Gardens

147.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

148.    Plaintiffs' residential lease agreement contained an express warranty that their unit was fit for human habitation, and that Defendant TCB Pedestal Gardens would regularly clean all common areas, maintain the common areas and facilities in a safe condition, arrange for collection and removal of trash and garbage, maintain all equipment and appliances in safe and working order, make necessary repairs with reasonable promptness, maintain exterior lighting in good working order, provide extermination services, as necessary, and maintain grounds and shrubs.

149.    At the beginning of the lease and prior to Plaintiffs entering into the lease agreement, Defendant TCB Pedestal Gardens affirmatively claimed and provided an express warranty that the unit was fit for human habitation and properly maintained and repaired.

150.    Defendants TCB Pedestal Gardens' statements regarding the fitness of the property for human habitation were knowingly false when made.

151.    Plaintiffs relied on these material misstatements.

152.    In breach of the express warranty of habitability, Plaintiffs' unit and Pedestal Gardens generally suffered from numerous defects and dangerous conditions described above.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A. Enter judgment in favor of Plaintiffs and against Defendant TCB Pedestal Gardens finding Defendant TCB Pedestal Gardens liable to Plaintiffs;

B. Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C. Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

D. Award the costs and expenses of this case, including attorneys' fees;

E. Award pre-judgement and post-judgement interest; and

F. Award all other further and general relief as the court deems just and necessary.

## COUNT XIV

**Violation of the Maryland Consumer Protection Act**
**Plaintiffs Against Owner-operator Defendants**

153.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

154.    The Consumer Protection Act (codified at Md. Code Ann., Com. Law, § 13-301 *et seq.*) ("CPA") prohibits unfair and/or deceptive trade practices. Each Plaintiff is a consumer as defined by the CPA.

155.    In violation of the CPA, Md. Code Ann., Com. Law , § 13-301 (1), Owner-operator Defendants knowingly made false and misleading oral statements which had the capacity, tendency, and effect of deceiving and misleading Plaintiffs that their residential unit

and the+ Pedestal Gardens property were fit for human habitation and/or properly maintained and repaired.

156.    In violation of the CPA, Md. Code Ann., Com. Law , § 13-301(3), Owner-operator Defendants knowingly failed to state a material fact, that deceived or tended to deceived Plaintiffs that their unit and the Pedestal Gardens property generally were fit for human habitation and/or properly maintained and repaired.

157.    In violation of the CPA, Md. Code Ann., Com. Law , § 13-301(9), at the inception of the lease, and prior to Plaintiffs entering into the lease agreement, Owner-operator Defendants affirmatively claimed to Plaintiffs that their unit and the Pedestal Gardens property generally were fit for human habitation and/or properly maintained and repaired, which was false.

158.    In violation of the CPA, Md. Code Ann., Com. Law, § 13-301(9), and prior to Plaintiffs renewing their lease agreement, Owner-operator Defendants affirmatively claimed to Plaintiffs that their unit and the Pedestal Gardens property generally were fit for human habitation and/or properly maintained and repaired, which was false.

159.    Owner-operator Defendants' statements that the fitness Plaintiffs' residential unit and the Pedestal Gardens property generally were fit for human habitation and properly maintained and/or repaired were false when made.

160.    Plaintiffs relied on these material misstatements.

161.    Pursuant to the operation of the Baltimore City Housing Code, and other applicable laws, it is unlawful to lease or offer to lease a residential dwelling unit that is not in compliance with the Baltimore City Housing Code.

162.    Rental residential dwelling units that are not in compliance with the Baltimore City Housing Code are uninhabitable.

163.    By leasing and offering for lease apartments in Pedestal Gardens, Owner-operator Defendants misrepresented to Plaintiffs and others similarly situated that the units were habitable.

164.    In breach of the CPA, Plaintiffs' unit and the Pedestal Gardens property generally suffered from numerous defects and dangerous conditions described above and were not fit for human habitation, properly maintained and/or repaired.

165.    As a result of Owner-operator Defendants' behavior, Plaintiffs have suffered severe damages.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A.  Enter judgment in favor of Plaintiffs and against Owner-operator Defendants finding Owner-operator Defendants liable to Plaintiffs;

B.  Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C.  Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

D.  Award the costs and expenses of this case, including attorneys' fees;

E.  Award pre-judgement and post-judgement interest; and

F.  Award all other further and general relief as the court deems just and necessary.

## COUNT XV

### Negligent Misrepresentation
### Plaintiffs Against All Defendants

166.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

167.    At the inception of Plaintiffs' lease and prior to the renewal of such lease, Defendants falsely asserted that Plaintiffs' residential unit and Pedestal Gardens generally were safe and fit for human habitation, human use, and were properly maintained and repaired.

168.    Defendants were negligent in making the statements regarding the safety of the Plaintiffs' unit and the Pedestal Gardens property generally, which were false at the time they were made. At the time Owner-operator Defendants entered into the lease agreement with the Plaintiffs, Owner-operator Defendants had a duty to inform Plaintiffs of the health hazards posed by their unit and the Pedestal Gardens property generally and made affirmative statements to the contrary to Plaintiffs.  In addition, Defendants were negligent in promising Plaintiffs that 24-hour security would be provided at Pedestal Gardens and that the security officers patrol the premises and respond to residents' concerns regarding crime and illegal activity occurring at Pedestal Gardens, which were false at the time they were made.

169.    Plaintiffs justifiably relied on Defendants' statements that the property was safe and fit for human habitation and use and was properly maintained and repaired. Were it not for Defendants' statements, Plaintiffs would not have entered into a lease agreement, let alone moved into their unit.

170.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered severe injuries.

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A. Enter judgment in favor of Plaintiffs and against Defendants finding Defendants liable to Plaintiffs;

B. Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C. Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

D. Award the costs and expenses of this case, including attorneys' fees;

E. Award pre-judgement and post-judgement interest; and

F. Award all other further and general relief as the court deems just and necessary.

**COUNT XVI**

**Private Nuisance**
**Plaintiffs Against Owner-operator Defendants**

171. Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

172. Owner-operator Defendants' conduct in failing to properly maintain and repair the Pedestal Gardens property and neglecting Plaintiffs' requests for repairs was unreasonable and caused substantial and unreasonable interference with Plaintiffs' use and enjoyment of their home and thereby constituted a nuisance.

173. As a result of this nuisance, Plaintiffs have suffered severe mental anguish, humiliation, disgrace, loss of dignity, physical injury, psychic injury and other injuries proximately caused by the nuisance.

43

**WHEREFORE**, Plaintiffs demand that they be awarded damages together with equitable relief as follows:

A. Enter judgment in favor of Plaintiffs and against Owner-operator Defendants finding Owner-operator Defendants liable to Plaintiffs;

B. Award each Plaintiff compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C. Award punitive damages;

D. Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with for example insurance deductibles paid for property damage, moving expenses, and/storage expenses in an amount to be determined at trial;

E. Award the costs and expenses of this case, including attorneys' fees;

F. Award pre-judgement and post-judgement interest; and

G. Award all other further and general relief as the court deems just and necessary.

Respectfully submitted,

MURPHY, FALCON & MURPHY, P.A.

_Nicholas A. Szokoly_
Nicholas A. Szokoly

_Edward L. Cardona_
Edward L. Cardona III

_Saidah A. Grimes_
Saidah A. Grimes
One South Street, Suite 2300
Baltimore, Maryland 21202

44

T: (410) 951-8744
F: (410) 539-6599
E: nick.szokoly@murphyfalcon.com
E: edward.cardona@murphyfalcon.com
E: saidah.grimes@murphyfalcon.com
*Attorneys for Plaintiffs*


## DEMAND FOR JURY TRIAL

Plaintiffs, by undersigned counsel, hereby demand a trial by jury.


*Nicholas A. Szokoly*
Nicholas A. Szokoly

45

OMB Approval 2502-0204
(Exp 03/31/2014)

# MODEL LEASE FOR SUBSIDIZED PROGRAMS.

1. **Parties and Dwelling Unit:** The parties to this Agreement are *Pedestal Garden Apts*

   referred to as the Landlord, and *Charity Speaks* referred to

   as the Tenant. The Landlord leases to the Tenant(s) unit number *A2*, located at *1512 Eutaw Pl*,

   *Baltimore MD 21217* in the project known as *Pedestal Garden Apts*.

2. **Length of Time (Term):** The initial term of this Agreement shall begin on *11|19|13* and end on *11 0|14*

   After the initial term ends, the Agreement will continue for successive terms of one *month* each until automatically
   terminated as permitted by paragraph 23 of this Agreement.

3. **Rent:** The Tenant agrees to pay $ *65.00* for the partial month ending on *11|30|13*. After that, tenant agrees to

   pay a rent of $ *163.00* per month. This amount is due on the *1st* day of the month at

   *325 McMechen Ot Baltimore MD 21 7*

   The Tenant understands that this monthly rent is less than the market (unsubsidized) rent due on this unit. This rent is
   available either because the mortgage on this project is subsidized by the Department of Housing and Urban Development (HUD)
   and/or because HUD makes monthly payments to the Landlord on behalf of the Tenant. The amount, if any, that HUD makes
   available monthly on behalf of the Tenant is called the tenant assistance payment and is shown on the "Assistance Payment" line
   of the Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures form which is Attachment No. 1
   to this Agreement.

4. **Changes in the Tenant's Share of the Rent:** The Tenant agrees that the amount of rent the Tenant pays and/or the amount of
   assistance that HUD pays on behalf of the Tenant may be changed during the term of this Agreement if:

   a. HUD or the Contract Administrator (such as a Public Housing Agency) determines, in accordance with HUD procedures, that
      an increase in rents is needed;
   b. HUD or the Contract Administrator changes any allowance for utilities or services considered in computing the Tenant's share
      of the rent;
   c. the income, the number of persons in the Tenant's household or other factors considered in calculating the Tenant's rent
      change and HUD procedures provide that the Tenant's rent or assistance payment be adjusted to reflect the change;
   d. changes in the Tenant's rent or assistance payment are required by HUD's recertification or subsidy termination procedures;
   e. HUD's procedures for computing the Tenant's assistance payment or rent change; or
   f. the Tenant fails to provide information on his/her income, family composition or other factors as required by the Landlord.

   The Landlord agrees to implement changes in the Tenant's rent or tenant assistance payment only in accordance with the time
   frames and administrative procedures set forth in HUD's handbooks, instructions and regulations related to administration of
   multifamily subsidy programs. The Landlord agrees to give the Tenant at least 30 days advance written notice of any increase in
   the Tenant's rent except as noted in paragraphs 11, 15 or 17. The Notice will state the new amount the Tenant is required to pay,
   the date the new amount is effective, and the reasons for the change in rent. The Notice will also advise the Tenant that he/she may
   meet with the Landlord to discuss the rent change.

5. **Charges for Late Payments and Returned Checks:** If the Tenant does not pay the full amount of the rent shown in paragraph 3
   by the end of the 5th day of the month, the Landlord may collect a fee of $5 on the 6th day of the month. Thereafter, the Landlord
   may collect $1 for each additional day the rent remains unpaid during the month it is due.

   The Landlord may not terminate this Agreement for failure to pay late charges, but may terminate this Agreement for non-

   payment of rent, as explained in paragraph 23. The Landlord may collect a fee of $ *30.00* on the second or any

   Page 1 of 8      Form HUD-90105-a
12/2007



PLAINTIFF'S
EXHIBIT
A

525fd663e376426d

OMB Approval 2502-0204
(Exp 03/31/2014)

additional time a check is not honored for payment (bounces). The charges discussed in this paragraph are in addition to the regular monthly rent payable by the Tenant.

6.  **Condition of Dwelling Unit:** By signing this Agreement, the Tenant acknowledges that the unit is safe, clean and in good condition. The Tenant agrees that all Appliances and equipment in the unit are in good working order, except as described on the Unit Inspection Report, which is Attachment No. 2 to this Agreement. The Tenant also agrees that the Landlord has made no promises to decorate, alter, repair or improve the unit, except as listed on the Unit Inspection Report.

7.  **Charges for Utilities and Services:** The following charts describe how the cost of utilities and services related to occupancy of the unit will be paid. The Tenant agrees that these charts accurately describe the utilities and services paid by the Landlord and those paid by the Tenant.

    a.  The Tenant must pay for the utilities in column (1). Payments should be made directly to the appropriate utility company. The items in column (2) are included in the Tenant's rent.

| (1)<br>Put "x" by any Utility Tenant pays directly | Type of Utility | (2)<br>Put an "x" by any utility included in Tenant Rent |
|---|---|---|
| | Heat | X |
| | Lights, Electric | X |
| | Cooking | X |
| | Water | X |
| | Other – Specify | |
| | | |

    b.  The Tenant agrees to pay the Landlord the amount shown in column (3) on the date the rent is due. The Landlord certifies that HUD had authorized him/her to collect the type of charges shown in column (3) and that the amounts shown in column (3) do not exceed the amounts authorized by HUD.

| (3)<br>Show Amount Tenant Pays to Landlord In Addition to Rent |
|---|---|
| Parking | $ |
| Other (Specify) | $ |
| | $ |
| | $ |
| | $ |

8.  **Security Deposits:** The Tenant has deposited $ 163. 00   with the Landlord. The Landlord will hold this security deposit for the period the Tenant occupies the unit. After the Tenant has moved from the unit, the Landlord will determine whether the Tenant is eligible for a refund of any or all of the security deposit. The amount of the refund will be determined in accordance with the following conditions and procedures.



Page 2 of 8



B Approval 2502-0204
(Exp 03/31/2014)

a.  The Tenant will be eligible for a refund of the security Deposit only if the Tenant provided the Landlord with the 30-day written notice of intent to move required by paragraph 23, unless the Tenant was unable to give the notice for reasons beyond his/her control.
b.  After the Tenant has moved from the unit, the Landlord must inspect the unit and complete another Unit Inspection Report. The Landlord will permit the Tenant to participate in the inspection, if the Tenant so requests.
c.  The Landlord will refund to the Tenant the amount of the security deposit plus interest computed at _permD1aw_ %,

beginning ___11 - 19 - 13___ ,less any amount needed to pay the cost of:

   (1) unpaid rent;
   (2) damages that are not due to normal wear and tear and are not listed on the Unit Inspection Report;
   (3) charges for late payment of rent and returned checks, as described in paragraph 5; and
   (4) charges for unreturned keys, as described in paragraph 9.

d.  The Landlord agrees to refund the amount computed in paragraph 8c within ___45___ days after the Tenant has permanently moved out of the unit, returned possession of the unit to the Landlord, and given his/her new address to the Landlord. The Landlord will also give the Tenant a written list of charges that were subtracted from the deposit. If the Tenant disagrees with the Landlord concerning the amounts deducted and asks to meet with the Landlord, the Landlord agrees to meet with the Tenant and informally discuss the disputed charges.
e.  If the unit is rented by more than one person, the Tenants agree that they will work out the details of dividing any refund among themselves. The Landlord may pay the refund to any Tenant identified in Paragraph 1 of this Agreement.
f.  The Tenant understands that the Landlord will not count the Security Deposit towards the last month's rent or towards repair charges owed by the Tenant in accordance with paragraph 11.

9.  **Keys and Locks:** The Tenant agrees not to install additional or different locks or gates on any doors or windows of the unit without the written permission of the Landlord. If the Landlord approves the Tenant's request to install such locks, the Tenant agrees to provide the Landlord with a key for each lock. When this Agreement ends, the Tenant agrees to return all keys to the

dwelling unit to the Landlord. The Landlord may charge the Tenant $ 25.00 for each key not returned.

10. **Maintenance:**
a.  The Landlord agrees to:
   (1) regularly clean all common areas of the project;
   (2) maintain the common areas and facilities in a safe condition;
   (3) arrange for collection and removal of trash and garbage;
   (4) maintain all equipment and appliances in safe and working order;
   (5) make necessary repairs with reasonable promptness;
   (6) maintain exterior lighting in good working order;
   (7) provide extermination services, as necessary; and
   (8) maintain grounds and shrubs.

b.  The Tenant agrees to:
   (1) keep the unit clean;
   (2) use all appliances, fixtures and equipment in a safe manner and only for the purposes for which they are intended;
   (3) not litter the grounds or common areas of the project;
   (4) not destroy, deface, damage or remove any part of the unit, common areas, or project grounds;
   (5) give the Landlord prompt notice of any defects in the plumbing, fixtures, appliances, heating and cooling equipment or any other part of the unit or related facilities; and
   (6) remove garbage and other waste from the unit in a clean and safe manner.

11. **Damages:** Whenever damage is caused by carelessness, misuse, or neglect on the part of the Tenant, his/her family or visitors, the Tenant agrees to pay:
a.  the cost of all repairs and do so within 30 days after receipt of the Landlord's demand for the repair charges; and

Form HUD-90105-a
12/2007

OMB Approval 2502-0204
(Exp 03/31/2014)

b. rent for the period the unit is damaged whether or not the unit is habitable. The Tenant understands that HUD will not make assistance payments for any period in which the unit is not habitable. For any such period, the Tenant agrees to pay the HUD-approved market rent rather than the Tenant rent shown in paragraph 3 of this agreement.

12. **Restrictions on Alterations:** No alteration, addition, or improvements shall be made in or to the premises without the prior consent of the Landlord in writing. The Landlord agrees to provide reasonable accommodation to an otherwise eligible tenant's disability, including making changes to rules, policies, or procedures, and making and paying for structural alterations to a unit or common areas. The Landlord is not required to provide accommodations that constitute a fundamental alteration to the Landlord's program or which would pose a substantial financial and administrative hardship. See the regulations at 24 CFR Part 8. In addition, if a requested structural modification does pose a substantial financial and administrative hardship, the Landlord must then allow the tenant to make and pay for the modification in accordance with the Fair Housing Act.

13. **General Restrictions:** The Tenant must live in the unit and the unit must be the Tenant's only place of residence. The Tenant shall use the premises only as a private dwelling for himself/herself and the individuals listed on the Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures, Attachment 1. The Tenant agrees to permit other individuals to reside in the unit only after obtaining the prior written approval of the Landlord. The Tenant agrees not to:

   a. sublet or assign the unit, or any part of the unit;
   b. use the unit for unlawful purposes;
   c. engage in or permit unlawful activities in the unit, in the common areas or on the project grounds;
   d. have pets or animals of any kind in the unit without the prior written permission of the Landlord, but the landlord will allow the tenant to keep an animal needed as a reasonable accommodation to the tenant's disability, and will allow animals to accompany visitors with disabilities who need such animals as an accommodation to their disabilities; or
   e. make or permit noises or acts that will disturb the rights or comfort of neighbors. The Tenant agrees to keep the volume of any radio, phonograph, television or musical instrument at a level, which will not disturb the neighbors.

14. **Rules:** The Tenant agrees to obey the House Rules, which are Attachment No. 3 to this Agreement. The tenant agrees to obey additional rules established after the effective date of this Agreement if:

   a. the rules are reasonably related to the safety, care and cleanliness of the building and the safety, comfort and convenience of the Tenants; and
   b. the Tenant receives written notice of the proposed rule at least 30 days before the rule is enforced.

15. **Regularly Scheduled Recertifications:** Every year around the ___1st___ day of ___July___, the Landlord will request the Tenant to report the income and composition of the Tenant's household and to supply any other information required by HUD for the purposes of determining the Tenant's rent and assistance payment, if any. The Tenant agrees to provide accurate statements of this information and to do so by the date specified in the Landlord's request. The landlord will verify the information supplied by the Tenant and use the verified information to re-compute the amount of the Tenant's rent and assistance payment, if any.

   a. If the Tenant does not submit the required recertification information by the date specified in the Landlord's request, the Landlord may impose the following penalties. The Landlord may implement these penalties only in accordance with the administrative procedures and time frames specified in HUD's regulations, handbooks and instructions related to the administration of multifamily subsidy programs.
      (1) Require the Tenant to pay the higher, HUD-approved market rent for the unit.
      (2) Implement any increase in rent resulting from the recertification processing without providing the 30-day notice otherwise required by paragraph 4 of this Agreement.
   b. The Tenant may request to meet with the Landlord to discuss any change in rent or assistance payment resulting from the recertification processing. If the Tenant requests such a meeting, the Landlord agrees to meet with the Tenant and discuss how the Tenant's rent and assistance payment, if any, were computed.

16. **Reporting Changes Between Regularly Scheduled Recertifications:**

   a. If any of the following changes occur, the Tenant agrees to advise the Landlord immediately.
      (1) Any household member moves out of the unit.
      (2) An adult member of the household who was reported as unemployed on the most recent certification or recertification obtains employment.



Page 4 of 8



Form HUD-90105-a
12/2007

OMB Approval 2502-0204
(Exp 03/31/2014)

(3) The household's income cumulatively increases by $200 or more a month.

b. The Tenant may report any decrease in income or any change in other factors considered in calculating the Tenant's rent. Unless the Landlord has confirmation that the decrease in income or change in other factors will last less than one month, the Landlord will verify the information and make the appropriate rent reduction. However, if the Tenant's income will be partially or fully restored within two months, the Landlord may delay the certification process until the new income is known, but the rent reduction will be retroactive and the Landlord may not evict the Tenant for nonpayment of rent due during the period of the reported decrease and the completion of the certification process. The Tenant has thirty days after receiving written notice of any rent due for the above described time period to pay or the Landlord can evict for nonpayment of rent. (Revised 3/22/89)

c. If the Tenant does not advise the Landlord of these interim changes, the Landlord may increase the Tenant's rent to the HUD-approved market rent. The Landlord may do so only in accordance with the time frames and administrative procedures set forth in HUD's regulations, handbooks and instructions on the administration of multifamily subsidy programs.

d. The Tenant may request to meet with the Landlord to discuss how any change in income or other factors affected his/her rent or assistance payment, if any. If the Tenant requests such a meeting, the Landlord agrees to meet with the Tenant and explain how the Tenant's rent or assistance payment, if any, was computed.

17. **Removal of Subsidy:**

a. The Tenant understands that assistance made available on his/her behalf may be terminated if events in either items 1 or 2 below occur. Termination of assistance means that the Landlord may make the assistance available to another Tenant and the Tenant's rent will be re-computed. In addition, if the Tenant's assistance is terminated because of criterion (1) below, the Tenant will be required to pay the HUD-approved market rent for the unit.

(1) The Tenant does not provide the Landlord with the information or reports required by paragraph 15 or 16 within 10 calendar days after receipt of the Landlord's notice of intent to terminate the Tenant's assistance payment.

(2) The amount the Tenant would be required to pay towards rent and utilities under HUD rules and regulations equals the Family Gross Rent shown on Attachment 1.

b. The Landlord agrees to give the Tenant written notice of the proposed termination. The notice will advise the Tenant that, during the ten calendar days following the date of the notice, he/she may request to meet with the Landlord to discuss the proposed termination of assistance. If the Tenant requests a discussion of the proposed termination, the Landlord agrees to meet with the Tenant.

c. Termination of assistance shall not affect the Tenant's other rights under this Agreement, including the right to occupy the unit. Assistance may subsequently be reinstated if the Tenant submits the income or other data required by HUD procedures, the Landlord determines the Tenant is eligible for assistance, and assistance is available.

18. **Tenant Obligation To Repay:** If the tenant submits false information on any application, certification or request for interim adjustment or does not report interim changes in family income or other factors as required by paragraph 16 of this Agreement, and as a result, is charged a rent less than the amount required by HUD's rent formulas, the Tenant agrees to reimburse the Landlord for the difference between the rent he/she should have paid and the rent he/she was charged. The Tenant is not required to reimburse the Landlord for undercharges caused solely by the Landlord's failure to follow HUD's procedures for computing rent or assistance payments.

19. **Size of Dwelling:** The Tenant understands that HUD requires the Landlord to assign units in accordance with the Landlord's written occupancy standards. These standards include consideration of unit size, relationship of family members, age and sex of family members and family preference. If the Tenant is or becomes eligible for a different size unit, and the required size unit becomes available, the Tenant agrees to:

a. move within 30 days after the Landlord notifies him/her that unit of the required size is available within the project; or

b. remain in the same unit and pay the HUD-approved market rent.

20. **Access by Landlord:** The Landlord agrees to enter the unit only during reasonable hours, to provide reasonable advance notice of his/her intent to enter the unit, and to enter the unit only after receiving the Tenant's consent to do so, except when urgency situations make such notices impossible or except under paragraph (c) below.

a. The Tenant consents in advance to the following entries into the unit:

(i) The tenant agrees to permit the Landlord, his/her agents or other persons, when authorized by the Landlord, to enter the unit for the purpose of making reasonable repairs and periodic inspections.

(ii) After the Tenant has given a notice of intent to move, the Tenant agrees to permit the Landlord to show the unit to prospective tenants during reasonable hours.



Page 5 of 8



OMB Approval 2502-0204
(Exp 03/31/2014)

    b.  If the Tenant moves before this Agreement ends, the Landlord may enter the unit to decorate, remodel, alter or otherwise prepare the unit for re-occupancy.

21. **Discrimination Prohibited:** The Landlord agrees not to discriminate based upon race, color, religion, creed, National origin, sex, age, familial status, and disability.

22. **Change in Rental Agreement:** The Landlord may, with the prior approval of HUD, change the terms and conditions of this Agreement. Any changes will become effective only at the end of the initial term or a successive term. The Landlord must notify the Tenant of any change and must offer the Tenant a new Agreement or an amendment to the existing Agreement. The Tenant must receive the notice at least 60 days before the proposed effective date of the change. The Tenant may accept the changed terms and conditions by signing the new Agreement or the amendment to the existing Agreement and returning it to the Landlord. The Tenant may reject the changed terms and conditions by giving the Landlord written notice that he/she intends to terminate the tenancy. The Tenant must give such notice at least 30 days before the proposed change will go into effect. If the Tenant does not accept the amended agreement, the Landlord may require the Tenant to move from the project, as provided in paragraph 23.

23. **Termination of Tenancy:**

    a.  To terminate this Agreement, the Tenant must give the Landlord 30-days written notice before moving from the unit.

    b.  Any termination of this Agreement by the Landlord must be carried out in accordance with HUD regulations, State and local law, and the terms of this Agreement.

    c.  The Landlord may terminate this Agreement for the following reasons:

      (1) the Tenant's material noncompliance with the terms of this Agreement;

      (2) the Tenant's material failure to carry out obligations under any State Landlord and Tenant Act;

      (3) drug related criminal activity engaged in on or near the premises, by any tenant, household member, or guest, and any such activity engaged in on the premises by any other person under the tenant's control;

      (4) determination made by the Landlord that a household member is illegally using a drug;

      (5) determination made by the Landlord that a pattern of illegal use of a drug interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents;

      (6) criminal activity by a tenant, any member of the tenant's household, a guest or another person under the tenant's control:

        (a) that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises);

        (b) or that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises;

      (7) if the tenant is fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees or that in the case of the State of New Jersey is a high misdemeanor;

      (8) if the tenant is violating a condition of probation or parole under Federal or State law;

      (9) determination made by the Landlord that a household member's abuse or pattern of abuse of alcohol threatens the health, safety, or right to peaceful enjoyment of the premises by other residents;

      (10) if the Landlord determines that the tenant, any member of the tenant's household, a guest or another person under the tenant's control has engaged in the criminal activity, regardless of whether the tenant, any member of the tenant's household, a guest or another person under the tenant's control has been arrested or convicted for such activity.

    d.  The Landlord may terminate this Agreement for other good cause, which includes, but is not limited to, the tenant's refusal to accept change to this agreement. Terminations for "other good cause" may only be effective as of the end of any initial or successive term.

The term material noncompliance with the lease includes: (1) one or more substantial violations of the lease; (2) repeated minor violations of the lease that (a) disrupt the livability of the project; (b) adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment to the leased premises and related project facilities, (c) interfere with the management of the project, or (d) have an adverse financial effect on the project (3) failure of the tenant to timely supply all required information on the income and composition, or eligibility factors, of the tenant household (including, but not limited to, failure to meet the disclosure and verification requirements for Social Security Numbers, or failure to sign and submit consent forms for the obtaining of wage and claim information from State Wage Information Collection Agencies), and (4) Non-payment of rent or any other financial obligation due under the lease beyond any grace period permitted under State law. The payment of rent or any other financial obligation due under the lease after the due date but within the grace period permitted under State law constitutes a minor violation.



Page 6 of 8



OMB Approval 2502-0204
(Exp 03/31/2014)

e.   If the Landlord proposes to terminate this Agreement, the Landlord agrees to give the Tenant written notice and the grounds for the proposed termination. If the Landlord is terminating this agreement for "other good cause," the termination notice must be mailed to the Tenant and hand-delivered to the dwelling unit in the manner required by HUD at least 30 days before the date the Tenant will be required to move from the unit and in accordance with State law requirements. Notices of proposed termination for other reasons must be given in accordance with any time frames set forth in State and local law. Any HUD-required notice period may run concurrently with any notice period required by State or local law. All termination notices must:

- specify the date this Agreement will be terminated;
- state the grounds for termination with enough detail for the Tenant to prepare a defense;
- advise the Tenant that he/she has 10 days within which to discuss the proposed termination of tenancy with the Landlord. The 10-day period will begin on the earlier of the date the notice was hand-delivered to the unit or the day after the date the notice is mailed. If the Tenant requests the meeting, the Landlord agrees to discuss the proposed termination with the Tenant;
- and advise the Tenant of his/her right to defend the action in court.

f.   If an eviction is initiated, the Landlord agrees to rely only upon those grounds cited in the termination notice required by paragraph e.

24. <u>Hazards:</u> The Tenant shall not undertake, or permit his/her family or guests to undertake, any hazardous acts or do anything that will increase the project's insurance premiums. Such action constitutes a material non-compliance. If the unit is damaged by fire, wind, or rain to the extent that the unit cannot be lived in and the damage is not caused or made worse by the Tenant, the Tenant will be responsible for rent only up to the date of the destruction. Additional rent will not accrue until the unit has been repaired to a livable condition.

25. <u>Penalties for Submitting False Information:</u> Knowingly giving the Landlord false information regarding income or other factors considered in determining Tenant's eligibility and rent is a material noncompliance with the lease subject to termination of tenancy. In addition, the Tenant could become subject to penalties available under Federal law. Those penalties include fines up to $10,000 and imprisonment for up to five years.

26. <u>Contents of this Agreement:</u> This Agreement and its Attachments make up the entire agreement between the Landlord and the Tenant regarding the unit. If any Court declares a particular provision of this Agreement to be invalid or illegal, all other terms of this Agreement will remain in effect and both the Landlord and the Tenant will continue to be bound by them.

27. Attachments to the Agreement: The Tenant certifies that he/she has received a copy of this Agreement and the following Attachments to this Agreement and understands that these Attachments are part of this Agreement.

a.   Attachment No. 1 – Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures, form HUD-50059

b.   Attachment No. 2 – Unit Inspection Report.

c.   Attachment No. 3 – House Rules (if any).

d.   Mold + Mildew

e.   VAWA

f.   _____

g.   _____

h.   _____

i.   _____

28. <u>Tenants' rights to organize:</u> Landlord agrees to allow tenant and tenant organizers to conduct on the property the activities related to the establishment or operation of a tenant organization set out in accordance with HUD requirements.





OMB Approval 2502-0204
(Exp 03/31/2014)

29. <u>Tenant Income Verification:</u> The Tenant must promptly provide the Landlord with any letter or other notice by HUD to a member of the family that provides information concerning the amount or verification of family income in accordance with HUD requirements.

30. The lease agreement will terminate automatically, if the Section 8 Housing Assistance contract terminates for any reason.

31. <u>Signatures:</u>

TENANT BY:

1. _____     _____
                                                  Date Signed

2. _____     _____/____/____
                                                  Date Signed

3. _____     _____/____/____
                                                  Date Signed


LANDLORD BY:

_____     _____
                                                  Date Signed


Public reporting burden – HUD is not requesting approval of any burden hours for the model leases since use of leases are a standard business practice in the housing rental industry. This information is required to obtain benefits. The request and required supporting documentation are sent to HUD or the Contract Administrator (CA) for approval. The lease is a contract between the owner of the project and the tenant(s) that explains the terms for residing in the unit. Leases are a standard business practice in the housing rental industry. Owners are required to use the HUD model lease which includes terms normally covered by leases used in the housing rental industry plus terms required by HUD for the program under which the project was built and/or the program providing rental assistance to the tenants.

This information is authorized by 24 CFR 5.360, 236.750, 880.606, 883.701, 884.215, 886. 127, 891.425, 891.625 and 891.765 cover lease requirements and provisions. This information is considered non-sensitive and does not require any special protection.



Page 8 of 8



Form HUD-90105-a
12/2007

 

# ADDENDUM TO MODEL LEASE FOR SUBSIDIZED PROGRAMS

1. **Parties:** The parties to this Addendum are **Pedestal Garden Apartments**

referred to as the Landlord, and *Chasity Spears*

referred to as the Tenant. The Landlord and Tenant have entered into an Agreement for the Tenant to rent and

occupy the premises located at *1512 Eutaw Pl A 2*

in the housing development known as **Pedestal Garden Apartments** ("Agreement").

2. **Change to the Agreement:** The Landlord and Tenant agree that the following change made to the Agreement shall be binding on both parties during the entire term of the Agreement and any extensions to the Agreement as if they had been included in original Agreement:

   (a) Paragraph 5 is deleted in its entirety and replaced with the following:

   **5. Charges for Late Payments and Returned Checks:** If the Tenant does not pay the full amount of the rent shown in paragraph 3 by the end of the 5th day of the month, the Landlord may collect a fee in accordance with provisions of the Resident Handbook, which is an attachment and a part of this Agreement. The Landlord may not terminate this Agreement for failure to pay late charges, but may terminate this Agreement for non-payment of rent, as explained in paragraph 23. On the second or any additional time a check is not honored for payment (bounces) the Landlord may collect a fee in accordance with provisions of the Resident Handbook, which is an attachment and a part of this Agreement. Additionally, on the second or any additional time a check is not honored for payment (bounces) the landlord may require rent to be paid by either certified check or money order. The charges discussed in this paragraph are in addition to the regular monthly rent payable by the Tenant.

**Signatures:**

_____   11-19-13
Tenant          Date   Landlord          Date

_____
Tenant          Date

_____
Tenant          Date

IR-086-A-07/08

# **MEGAN'S LAW**

MEGAN'S LAW STATEMENT:  Under Maryland Law, the County Prosecutor determines whether and how to provide notice of the presence of convicted sex offenders in an area.

Tenant acknowledges and understands that the Property Owner, Property Employees and Interstate Realty Management Company as Agent for the Owner are not entitled to notification by the County Prosecutor under Megan's Law and are unable to obtain such information for you.  After taking occupancy of your apartment, you may contact the County Prosecutor for such further information as may be disclosed to you.

Signature:

Tenant

By
Head of Household x_ *Christy Spears*

Date Signed _11/19/13_

Spouse/Co-head of Household _____

Date Signed _____

Co-head of Household _____

Date Signed _____

Landlord

By _*Jada Jur*_

Date Signed _11-19-2013_

#IR-561  (4/98)

Attachment 2
OMB Approval No. 2502-0204

## LEASE ADDENDUM
### VIOLENCE AGAINST WOMEN AND JUSTICE DEPARTMENT REAUTHORIZATION ACT OF 2005

| TENANT | LANDLORD | UNIT NO. & ADDRESS |
|--------|----------|--------------------|
| Chasity Spears | Pedestal Garden Apts | 1512- A 2 |

This lease addendum adds the following paragraphs to the Lease between the above referenced Tenant and Landlord.

**Purpose of the Addendum**

The lease for the above referenced unit is being amended to include the provisions of the Violence Against Women and Justice Department Reauthorization Act of 2005 (VAWA).

**Conflicts with Other Provisions of the Lease**

In case of any conflict between the provisions of this Addendum and other sections of the Lease, the provisions of this Addendum shall prevail.

**Term of the Lease Addendum**

The effective date of this Lease Addendum is ___11|19|13___ . This Lease Addendum shall continue to be in effect until the Lease is terminated.

**VAWA Protections**

1. The Landlord may not consider incidents of domestic violence, dating violence or stalking as serious or repeated violations of the lease or other "good cause" for termination of assistance, tenancy or occupancy rights of the victim of abuse.

2. The Landlord may not consider criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of that abuse.

3. The Landlord may request in writing that the victim, or a family member on the victim's behalf, certify that the individual is a victim of abuse and that the Certification of Domestic Violence, Dating Violence or Stalking, Form HUD-91066, or other documentation as noted on the certification form, be completed and submitted within 14 business days, or an agreed upon extension date, to receive protection under the VAWA. Failure to provide the certification or other supporting documentation within the specified timeframe may result in eviction.

_____          ___11/19/13___
Tenant                                    Date

_____          ___11|19|13___
Landlord                                  Date

Form **HUD-91067**
(09/2008)



# $\mathscr{P}$EDESTAL $\mathscr{G}$ARDENS

### $\mathscr{A}$ffordable $\mathscr{A}$partments



*Maryland Relay   800-201-7165*

# Lease Attachment

Date: 11/19/13

I __Chasity Spear__ do understand that as a policy of **Pedestal Gardens Apartments** I, have to report all changes in my income, household family composition and any other related changes that will affect my rent.

**These changes have to be reported to management with in 7 to 10 business days of the change.**

I have been informed that all changes must be reported by coming into the office and signing the **"Reported Changes Log"**, there will be no changes reported **via telephone.**

Should I not report these changes within the time allowed, I am aware that my subsidy may be terminated and I will be held accountable for the market rate rent.

**I have read and understand paragraph 15 of the lease titled "Regularly Scheduled Recertification's" and paragraph 16 of the lease titled "Reporting Changes between Regularly Scheduled Recertification's"**

Chasity Spear
_____
Resident

11/9/13
_____
Date

_____
Landlord / Agent

11/19/13
_____
Date

*325 McMechen St.*
*Baltimore, Maryland 21217*

**Pedestal Garden Apartment**
**325 McMechen Street**
**Baltimore, Maryland 21217**
**410-523-2341**
**EHO**

I, _Chasity Spears_, **applicant for Pedestal Garden Apartments, do hereby certify that I have received a copy of the EIV and You Brochure on** _11 | 19 | 13_ .

_[signature]_
**Applicant**

_[signature]_
**Leasing Consultant**
_assistant manager_



# PEDESTAL GARDENS

*Affordable Apartments*

Maryland Relay  800-201-7165



# ADDENDUM

I (We) acknowledge receipt of the **Resident's Right and Responsibilities Book**, the **HUD Fact Sheet** and the Applying for **HUD Housing Assistance** handout.

_____        _____
Resident/Applicant Signature                              Date  11/19/13


_____        _____
Resident/Applicant Signature                              Date


_____        _____
Management Signature                                        Date  11/19/13


*325 McMechen St.*
*Baltimore, Maryland 21217*
*mgt. office*

## MOLD/MILDEW ATTACHMENT TO LEASE

This Mold/Mildew Attachment ("Attachment") dated _November 19_, 20_13_, is

attached to and made part of the Lease dated _November 19_, 20_13_ ("Lease"),

by and between _Pedestal Garden Apts_ ("Landlord")

and _Chasity Spears_

("Resident") for Unit Number _A 2_ ("Unit") in _1512 Eutaw Pl_

_Pedestal Garden_ Apartments ("Apartments").

Resident acknowledges that it is necessary for Resident to provide appropriate climate control, keep the Unit clean and take other measures to retard and prevent mold and mildew from accumulating in the Unit. Resident agrees to clean and dust the Unit on a regular basis and to remove visible moisture accumulating on windows, walls and other surfaces as soon as reasonably possible. Resident agrees not to block or cover any of the heating ventilation or air-conditioning ducts in the Unit. Resident also agrees to immediately report to the Management Office: (1) any evidence of a water leak or excessive moisture in the Unit, as well as in any storage room, garage or other common areas; (2) any evidence of mold or mildew-like growth that cannot be removed by simply applying a common household cleaner and wiping the area; (3) any failure or malfunction in the heating, ventilation or air-conditioning system in the Unit; and (4) any inoperable doors or windows. Resident further agrees that Resident shall be responsible for damage to the Unit and Resident's property as well as personal injury to Resident and Occupants resulting from Resident's failure to comply with the terms of this Attachment.

A default under the terms of this Attachment shall be deemed a material default under the terms of the Lease, and Landlord shall be entitled to exercise its rights and remedies at law or in court. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Attachment and the terms of the Lease, the terms of this Attachment shall control. Any term that is capitalized but not defined in this Attachment that is capitalized and defined in the Lease shall have the same meaning for purposes of this Attachment as it has for purposes of the Lease.

Resident acknowledges receiving a copy of the "Resident Tip Sheet" (#IR-696) for the prevention of mold growth in apartment homes.

Resident or Residents                          Landlord:
(All Residents must sign here)

_Chasity Spears_                              _Jada June_  11/19/13
_11/19/2013_

Unit No: _1512 - A 2_                          #IR-673 (06/04)

# LEASE ADDENDUM

07/28/2016

CHASITY SPEARS

1512 Eutaw Place Apt. A-2
Baltimore, MD 21217

Dear CHASITY SPEARS:

This is to notify you that on the basis of our recent review of your income and family
composition, your rent has been adjusted as indicated below.  This notification amends
Paragraph 5 of your lease agreement which sets forth the amount of rent you pay each
month.

| | |
|---|---|
| Contract Rent: | $ 1,394 |
| Total Tenant Payment: | $ 149 |
| Utility Allowance: | $ 0 |
| Tenant Rent: | $ 149 |
| Assistance Payment: | $ 1,245 |
| Effective Date: | 11/01/2016 |

Attached for your records is a copy of the Form HUD-50059, Certification and
Recertification of Tenant Eligibility.  You should substitute this Form HUD-50059 in
place of the Form 50059 previously attached to your lease.  This Form shows you the
income we used to calculate your new rent and the amount of rental assistance, if any,
that HUD pays monthly on your behalf.

You may contact me if you wish to arrange a meeting to discuss this change.  Thank
you for your cooperation.

_____    7/29/16
Tenant Signature                                   Date

_____    7.29.16
Landlord Signature                                Date

**CHASITY SPEARS**, *et al.*        *    IN THE

         Plaintiffs             *    CIRCUIT COURT

         v.                *    FOR

**TCB PEDESTAL GARDENS LLC**, *et al.*    *    BALTIMORE CITY

                                   *    CASE NO.  24C18004935

                 Defendants

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

<u>**FIRST SET OF INTERROGATORIES TO DEFENDANT**</u>
<u>**MWR INVESTIGATIONS INC.**</u>

TO:          DEFENDANT MWR INVESTIGATIONS INC.

FROM:       PLAINTIFF CHASITY SPEARS

## I.      <u>INSTRUCTIONS</u>

1.     Pursuant to Maryland Rule 2-421, **you** are required to answer the following interrogatories within thirty (30) days after service or within the time otherwise required by court order or by the Maryland Rules.  (Standard Instruction: Preamble).

2.     In accordance with Rule 2-421(b), **your** response shall set forth the interrogatory, and shall set forth the answer to the interrogatory "separately and fully in writing under oath" or "shall state fully the grounds for refusal to answer any interrogatory."  The response shall be signed by **you**.  (Standard Instruction (a)).

3.     Also in accordance with Rule 2-421(b), **your** answers "shall include all information available" to **you** "directly or through agents, representatives, or attorneys." (Standard Instruction (b)).  If **you** do not have the information necessary to answer an Interrogatory, but **you** know a **person** who may have such information, identify such **person** in **your** answer to the Interrogatory.  When answers are made by a corporate defendant, state the

name, address and title of the person supplying the answers under oath and the source of the answer.

4.    In accordance with Maryland Discovery Guideline 5 (a), no part of an interrogatory should be left unanswered merely because an objection is interposed to another part of an interrogatory.

5.    Where a claim of privilege is asserted in objecting to any interrogatory or part thereof, and information is not provided on the basis of such assertion:

A.    The party asserting the privilege shall in the objection to the interrogatory or part thereof identify with specificity the nature of the privilege (including work product) that is being claimed;

B.    The following information should be provided in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information,

(1)    For oral **communications**:

a.    the name of the person making the **communication** and the names of persons present while the **communication** was made, and, where not apparent, the relationship of the persons present to the person making the **communication**;
b.    the date and place of the **communication**; and
c.    the general subject matter of the **communication**.

(2)    For **documents**:

a.    the type of **communication**,
b.    the general subject matter of the **communication**,
c.    the date of the **communication**, and
d.    such other information as is sufficient to identify the **communication**, including, where appropriate, the author, addressee, custodian, and any other recipient of the **communication**, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

(Based on Maryland Discovery Guideline 5).

6.    If any **document** responsive to an Interrogatory has been lost, discarded, destroyed or otherwise is no longer in **your** possession, custody or control or is not available or accessible to **you**, **identify** the **document** as completely as possible.  If the **document** is not in **your** possession, custody or control or available or accessible to **you**, **identify** the current location of the **document**, the **document**'s current custodian and the reason why the **document** is no longer in **your** possession, custody or control or available or accessible to **you**.  If the **document** has been lost, identify the last known location of the **document** and the **person** who last had possession, custody, or control over the **document**. If the **document** has been discarded or destroyed, **identify** the date of such action, the **person** authorizing such action, the **person** actually discarding or destroying the **document** and the reason for the discarding or destruction of the **document**.

7.    If pursuant to Rule 2-421(c), **you** elect to specify and produce business records of **yours** in answer to any interrogatory, **your** specification shall be in sufficient detail to enable the interrogating party to locate and identify the records from which the answer may be ascertained. (Standard Instruction (d)).

8.    In accordance with Maryland Rule 422(d)(1), any **documents** shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the request.  In accordance with Maryland Rule 2-422(d)(1), electronically stored information shall be produced in its native file format (*i.e.* the electronic file format of the application in which such information is normally created, viewed and/or modified, such as Microsoft Word ) and in such a way that all meta-data (*i.e.* information embedded in the native file that is not ordinarily viewable or printable from the application that generated, edited or modified such native file and/or information generated automatically by the operation of a

computer or other information technology system that a native file is created, modified, transmitted, deleted or otherwise manipulated by a user of such system) is preserved.   If **documents**, including electronically stored information, are produced in a scanned version, they shall be produced in multipage pdf format.

9.     If **you** perceive any ambiguities in a question, instruction, or definition, set forth the matter deemed ambiguous and the construction used in answering.   (Standard Instruction (e)).

10.     The Definitions contained in the following section should be used to determine the meaning of a particular Interrogatory, unless otherwise indicated by the context.   Consistent with the Committee Note to Maryland Form Interrogatory No. 2, defined terms have been printed in bold type in order to flag the use of a defined term in the actual interrogatories and to alert the responding party to the need to consult the definition.   Efforts have been made to print all defined terms in bold type; however, if a term has been defined in these interrogatories, but is not printed in bold type, the term nonetheless should be treated as if it were printed in bold type.

11.     Unless otherwise specified, these interrogatories call for **documents** from January 1, 2008 to the present.

12.     Pursuant to Rule 2-401(e), these interrogatories are continuing in nature.   If **you** obtain further material information before trial, **you** are required to supplement **your** answers promptly.   (Standard Instruction (c)).

## II.  DEFINITIONS

1.     "**Document**" includes electronically stored information and any writing, drawing, graph, chart, photograph, sound recording, image and other data or data compilation from which information can be obtained, translated, if necessary, through detection devices into reasonably

usable form. (Standard General Definition (a)). "**Document**" also includes any original, draft (whether disseminated or not) and any other copy.

2.      "**Communication**" means the transmittal of information by any means, including any oral conversation, transaction or interaction (including telephone calls) and any written transaction or interaction (including letters, memoranda, notes, telecopies, facsimiles, telex, electronic transmission of information or other transfer of **documents**). The transfer of **documents** between **persons** shall constitute a **communication**. Any internal conversation, transaction, or interaction (including any "memorandum to file") by, between or among any **persons**, directors, officers, employees, representatives, agents, consultants or other retained **persons** (including in house or outside retained attorneys), predecessors, successors, assigns, parent corporations, subsidiaries or affiliates also constitutes a **communication**.

3.      "**Person**" includes an individual, general or limited partnership, joint stock company, unincorporated association or society, municipal or other corporation, incorporated association, limited liability partnership, limited liability company, the State, an agency or political subdivision of the State, a court, and any other governmental entity. (Standard General Definition (c)).

4.      "**Identify**," "**Identity**," or "**Identification**," (1) when used in reference to a natural **person**, means that **person**'s full name, last known address, home and business telephone numbers, and present occupation or business affiliation; (2) when used in reference to a **person** other than a natural **person**, means that **person**'s full name, a description of the nature of the **person** (that is, whether it is a corporation, partnership, etc., under the definition of **person** below), and the **person**'s last known address, telephone number, and principal place of business; (3) when used in reference to any **person** after the **person** has been properly identified

previously means the **person**'s name;  and (4) when used in reference to a **communication**, requires **you** to state the date, the author (or, if different, the signer or signers), the addressee, the identity of the present custodian of the **communication**, and the type of **communication** (e.g., letter, memorandum, telegram, or chart) or to attach an accurate copy of the **communication** to **your** answer, appropriately labeled to correspond to the interrogatory. (Standard General Definition (b)).   "**Identify**," "**Identity**," or "**Identification**," when referring to a **communication**, means to set forth the date and place of the **communication**, whether the **communication** was oral, written or otherwise transmitted, any **document** embodying the **communication**, the **person** or **persons** who sent, received, participated in, or had knowledge of the **communication**, and the substance in detail of the **communication**.

5.      "**Describe**" or "**state**" means to set forth fully and unambiguously every fact relevant to a specific and fully responsive answer to the Interrogatory.

6.      The term "**concerning**" means relating to, reflecting, referencing, describing, evidencing, constituting, or comprising.

7.      The present tense includes the past and future tenses. The singular includes the plural, and the plural includes the singular. "All" means "any and all"; "any" means "any and all." "Including" means "including but not limited to." "And" and "or" encompass both "and" and "or."  "Each" means "each and every." Words in the masculine, feminine or neuter form shall include each of the other genders. "Date" means the exact day, month and year if ascertainable, or, if not, the best approximation of the day, month or year, including any relationship to other events.

8.     The term **"Complaint"** refers to the complaint filed by the Plaintiffs in this case and any subsequent amended complaint(s) and, if applicable, any third-party complaint.   The terms "action," "case" or "litigation" refer generally to this case and all issues raised in this case.

9.     The terms **"you"** or **"your"** include the **person**(s) to whom these requests are directed and any of that person's agents, servants, employees, representatives and attorneys.

10.     The terms **"Pedestal Gardens"** and/or the **"Property"** mean the Pedestal Gardens Apartments situated in Baltimore City, Maryland as more fully described in the **Complaint** as amended, including but not limited to the residential units, common areas, limited common areas, leasing office, commercial shops, buildings, fencing, structures, parking lots, walkways, sidewalks and/or laundry and/or other facilities.

11.     The term **"Plaintiffs"** includes all of the individual plaintiffs in this case and any additional **persons** that may be added as individual plaintiffs in the action, if applicable.

12.     The term **"Defendants"** means and includes all of the defendants in this case and any additional entities or persons that may be added as defendants in the action, if applicable.

13.     The term **"Co-Defendant(s)"** means and includes all of the defendants in this case, except **you**, and any additional entities or persons that may be added as defendants in the action, if applicable.

14.     The term **"TCB Pedestal Gardens"** means Defendant TCB Pedestal Gardens LLC.

15.     The term **"Interstate"** means Defendant Interstate Realty Management Company.

16.     The term **"Alexander Security"** means Defendant Alexander Security Consultants, LLC.

17.     The term **"MWR Investigations"** means Defendant MWR Investigations Inc.

18.     The term **"Security Companies"** means collectively Defendants **MWR Investigations** and **Alexander Security**.

19.     The term **"Community Builders"** means Defendant The Community Builders, Inc.

20.     The term **"Owner-operators"** and/or **"Owner-operator Defendants"** means collectively Defendants **TCB Pedestal Gardens**, **Interstate**, and **Community Builders**.

21.     The term **"Unidentified Security Officers"** means the unidentified individuals contracted for and retained by **Owner-operator Defendants** to perform security-related functions at **Pedestal Gardens**.

22.     The term **"Security Defendants"** means collectively Defendants **Alexander Security**, **MWR Investigations**, and **Unidentified Security Officers**.

23.     The term **"Security Officer(s)"** means any **Person** providing safety and/or security services at **Pedestal Gardens**.

24.     The term **"HUD"** means the United States Department of Housing and Urban Development, including any officers, agents, assigns, employees and/or representatives thereof.

25.     The term **"HAP"** means a housing assistance payment contract designed to supplement rental payments.

26.     The term **"BPD"** means the Baltimore City Police Department, including any officers, agents, assigns, employees and/or representatives thereof.

27.     The term **"Resident(s)"** means any **Person**, including the **Person's** children, charge(s), dependent(s), ward(s) and/or minor(s), who entered into a residential lease agreement with any of the **Owner-Operators** to live and/or reside at **Pedestal Gardens** from January 1, 2008 to present.

### III.  INTERROGATORIES

**Interrogatory No. 1.**    Identify with specificity each individual or entity, including addresses and telephone number, titles and position, who gathered or furnished information for or assisted in the preparation of these answers to interrogatories and/or the request for production of documents served upon you, and, for each individual or entity, please set forth a description of what information was furnished or gathered by each individual or entity.

**Interrogatory No. 2.**    If any person might be liable to satisfy part or all of a judgment that might be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment, identify that person, state the applicable policy limits of any insurance agreement under which the person might be liable, and describe any question or challenge raised by the person relating to coverage for this action. Further, indicate any exclusion under any insurance policy which is or may be applicable to the claims set forth in the Complaint, as amended, setting forth the precise language of each exclusion and the facts upon which you contend any exclusion is or may be applicable. (Based on Standard General Interrogatory No. 5).

**Interrogatory No. 3.**    Identify each person, other than a person intended to be called as an expert witness at trial, having discoverable information that tends to support a position that you have taken or intend to take in this action, including any claim for damages, and state the subject matter of the information possessed by that person. (Standard General Interrogatory No. 1).

**Interrogatory No. 4.**    Identify each person, other than a person intended to be called as an expert witness at trial, known to you who has discoverable information regarding the facts and circumstances relating to the occurrence or the allegations contained in the complaint and state the subject matter of the information possessed by that person.

**Interrogatory No. 5.**      If you intend to rely upon any **documents**, electronically stored information, or tangible things to support a position that you have taken or intend to take in the action, including any claim for damages, provide a brief description, by category and location, of all such **documents**, electronically stored information, and tangible things, and identify all persons having possession, custody, or control of them. (Based on Standard General Interrogatory No. 3.)

**Interrogatory No. 6.**      Identify each person whom you expect to call as an expert witness at trial, state the subject matter on which the expert is expected to testify, state the substance of the findings and opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and, with respect to an expert whose findings and opinions were acquired in anticipation of litigation or for trial, summarize the qualifications of the expert, state the terms of the expert's compensation, and attach to your answers any available list of publications written by the expert and any written report made by the expert concerning the expert's findings and opinions. (Standard General Interrogatory No. 2.).

**Interrogatory No. 7.**      If you contend that some person or entity other than yourself (including the Plaintiffs) acted in such a manner as to cause or contribute to the damages alleged in this case, identify each such person or entity and give a concise statement of the facts, including identification of all documents referenced in your answer.

**Interrogatory No. 8.**      Describe your contractual relationships, whether formal or informal, written or oral, with each of the Co-Defendants in this case and identify the custodian of any such agreement.

**Interrogatory No. 9.**      Identify all of your corporate directors, members, principals and/or officers from January 1, 2008 to present, including name, all professional title(s) held by

them during that period and a brief description of their corresponding employment responsibilities.

**Interrogatory No. 10.**   Provide the names, addresses and dates of employment of all individuals employed by you who worked at and/or provided services to Pedestal Gardens, whether as an employee or independent contractor, from January 1, 2008 to present, including name, all professional title(s) held by them during that period and a brief description of their corresponding employment responsibilities.

**Interrogatory No. 11.**   For each and every individual identified in your answers to Interrogatories Nos. 9 and 10, describe with particularity his/her responsibility for establishing and/or enforcing operational, security and/or safety procedures and maintaining those respective procedures at Pedestal Gardens from January 1, 2008 to present.

**Interrogatory No. 12.**   Describe your contractual relationships, whether formal or informal, written or oral, with BPD, including in your answer the nature of the relationship, the benefits conferred upon you, the obligations required of you, the rights provided you, the name of any program of which you are a part and identify the custodian of any such agreement.

**Interrogatory No. 13.**   Identify and give the substance of each and every statement, action or admission against interest, declaration against interest, or otherwise, whether oral, written, by conduct, silence or otherwise, which you contend was made by the Plaintiffs or any person on behalf of, related to or concerning the Plaintiffs regarding the claims made in the Complaint, as amended, providing the name, address, telephone number and occupation of each person who has personal knowledge of such conduct or the making of each such statement, as well as indicating whether each such statement has been reduced to writing, recorded, or otherwise memorialized. If you have in your control any written or recorded statements made by

Plaintiffs, attach a copy of or sufficiently identify any such statement(s) or a transcript of any such recorded statement(s) with your answers to these Interrogatories.

**Interrogatory No. 14.**   State the substance of any statements you claim are admissions against interest made by employees, agents or representatives of the Defendants or any one of them with regard to the subject matter of this action.

**Interrogatory No. 15.**   Provide a summary of the work and/or services performed by any individual and/or entity hired, awarded a contract to and/or paid by you in connection with work and/or services provided at the Property from January 1, 2008 to the present, including any and all contractors/subcontractors and/or employees, representatives and/or agents, and identify the date or date range each individual and/or entity worked and/or provided services at the Property and attach all documents to which you refer in your answer to this interrogatory.

**Interrogatory No. 16.**   State with specificity what, if any, codes (including the Year, Title, Section, Chapter, page, etc. of any appropriate code), provisions, specifications, general orders, standing orders, by-laws, regulations, guidelines, laws, statutes and/or other requirements you are obligated to follow, voluntarily follow and/or adhere to in the work and/or services you provide at Pedestal Gardens, including any requirements which relate to security and identify and/or attach all documents to which you refer in your answer to this interrogatory.

**Interrogatory No. 17.**   Describe with specificity any and all emergency services you performed at the Property from January 1, 2008 to the present, including in your answer what factors you used to determine whether or not an emergency existed, the procedures which you utilized during any and all emergency services (including any equipment, materials, personnel, etc.), and identify and/or attach all documents to which you refer in your answer to this interrogatory.

**Interrogatory No. 18.**    Identify all persons who are or were responsible for establishing safety and/or security procedures and maintaining safety and/or security at the Property from January 1, 2008 to present.

**Interrogatory No. 19.**    If you are raising or claiming any affirmative defenses (i.e., contributory negligence, statute of limitations, immunity, etc.) please state in detail the basis for any affirmative defense, identify any documents, recordings, statements, or things that substantiate and/or support any affirmative defense, and identify any persons with knowledge of facts and/or circumstances pertinent to any affirmative defense.

**Interrogatory No. 20.**    Identify all financial accounts, including without limitation, banking accounts, operating accounts, reserve accounts, escrow accounts, investment accounts, brokerage accounts, sweep accounts, lines of credit, lines of equity and/or any other financial accounts, you maintain, hold and/or are an authorized user and/or signatory which in any way relate to, include, acquire, yield, return, disburse and/or distribute monies concerning the Property and/or the Residents.

**Interrogatory No. 21.**    For each and every account identified in your answer to Interrogatory No. 20, identify all person(s) and/or entities that perform accountant and/or accounting work and/or services for you with regard to those accounts.

**Interrogatory No. 22.**    Identify the person(s) who received complaints from Residents and who had charge of maintaining your records regarding Residents' and/or Plaintiffs' complaints for the period January 1, 2008 to present including in your answer the procedure, if any, for receiving, recording and investigating Residents' and/or Plaintiffs' complaints, the person(s) involved, the date the procedure was instituted and whether this procedure was followed at Pedestal Gardens.

**Interrogatory No. 23.**   If you, or any of your agents, representatives, employees, members, officers and/or principals and/or any third party acting on your behalf, performed any inspections of the Property from January 1, 2008 to present, identify the date of each inspection, the identity of the person(s) and/or entities performing each inspection and a description of all findings.

**Interrogatory No. 24.**   Identify with specificity the application, interview and hiring process for your Security Officers, including what background checks, criminal history investigations, reference checks and/or gun carrying license/permit checks, if any, were performed by you and/or any person and/or entity you hired to perform the aforementioned checks and/or investigations and identify and/or attach all documents to which you refer in your answer to this interrogatory.

**Interrogatory No. 25.**   For each of your Security Officers who performed work and/or provided services at Pedestal Gardens, identify the training program, if any, each individual Security Officer attended and/or participated in prior to being assigned to the Property, including in your answer, the name of the attendee, a synopsis of the curriculum, the dates attended, the location of the program, whether or not the attendee completed the program and whether the program was specific to providing work and/or services at the Property and identify and/or attach all documents to which you refer in your answer to this interrogatory.

**Interrogatory No. 26.**   Describe what, if any, continuing training programs are required of your Security Officers after they are hired by you, including whether or not the training programs were mandatory and/or voluntary, the names of all Security Officers who attended continuing training programs from January 1, 2008 to present, a synopsis of the curriculum of each continuing training program, the dates attended, the location of the program, whether or not

the attendee completed the program and whether the program was specific to providing work and/or services at the Property and identify and/or attach all documents to which you refer in your answer to this interrogatory.

Nicholas A. Szokoly
Edward L. Cardona III
Saidah A. Grimes
Murphy, Falcon & Murphy
One South Street, Suite 2300
Baltimore, Maryland 21202
(410) 951-8744
*Attorneys for Plaintiffs*

**CHASITY SPEARS**, *et al.*    * IN THE

   Plaintiffs      * CIRCUIT COURT

   v.        * FOR

**TCB PEDESTAL GARDENS LLC,**  * BALTIMORE CITY
*et al.*

           *

   Defendants     CASE NO.  24C18004935
* * * * * * * * * * * * *

**PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO
MWR INVESTIGATIONS INC.**

TO:  DEFENDANT MWR INVESTIGATIONS INC.

FROM:  PLAINTIFF CHASITY SPEARS

  Plaintiff, by undersigned counsel and pursuant to Maryland Rule 2-422, hereby requests

that Defendant produce the following Documents for the purpose of inspection and copying at

the offices of Murphy, Falcon & Murphy, One South St., 23rd Floor, Baltimore, MD, 21202.

**I.**  **INSTRUCTIONS**

  1. Pursuant to Maryland Rule 2-422, **you** are required to serve a written response,

within thirty (30) days after service or within the time otherwise required by the Maryland Rules

or by court order, stating, with respect to each item or category, that the inspection and related

activities will be permitted as requested, unless the request is refused, in which event the reasons

for the refusal shall be stated.  If the refusal relates to part of an item or category, the part shall

be specified.

  2. If a portion of a **document** is responsive, the entire **document** should be

produced.  If there are no documents responsive to any particular request or category, **you**r

response should affirmatively state so.

1357-000 /216272.DOC

3.       Where a claim of privilege is asserted in objecting to any request or part thereof, and information is not provided on the basis of such assertion:

A.       The party asserting the privilege shall in the objection to the request or part thereof identify with specificity the nature of the privilege (including work product) that is being claimed;

B.       The following information should be provided in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information,

(1)    For oral **communications**:

a.       the name of the person making the **communication** and the names of persons present while the **communication** was made, and, where not apparent, the relationship of the persons present to the person making the **communication**;
b.       the date and place of the **communication**; and
c.       the general subject matter of the **communication**.

(2)    For **documents**:

a.       the type of **communication**;
b.       the general subject matter of the **communication**;
c.       the date of the **communication**; and,
d.       such other information as is sufficient to identify the **communication**, including, where appropriate, the author, addressee, custodian, and any other recipient of the **communication**, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

(Based on Maryland Discovery Guideline 5).

4.       If any **document** responsive to a request has been lost, discarded, destroyed or otherwise is no longer in **your** possession, custody or control or is not available or accessible to **you**, **identify** the **document** as completely as possible.  If the **document** is not in **your** possession, custody or control or available or accessible to **you**, **identify** the current location of the **document**, the **document**'s current custodian and the reason why the **document** is no longer in **your** possession, custody or control or available or accessible to **you**.  If the **document** has

been lost, identify the last known location of the **document** and the **person** who last had possession, custody, or control over the **document**. If the **document** has been discarded or destroyed, **identify** the date of such action, the **person** authorizing such action, the **person** actually discarding or destroying the **document** and the reason for the discarding or destruction of the **document**.

5.       In accordance with Maryland Rule 422(d)(1), any **documents** shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the request.  In accordance with Maryland Rule 2-422(d)(1), electronically stored information shall be produced in its native file format (*i.e.* the electronic file format of the application in which the information is normally created, viewed and/or modified, such as Microsoft Word ) and in such a way that all meta-data (*i.e.* information embedded in the native file that is not ordinarily viewable for printable from the application that generated, edited or modified such native file and/or information generated automatically by the operation of a computer or other information technology system that a native file is created, modified, transmitted, deleted or otherwise manipulated by a user of such system) is preserved.   If **documents**, including electronically stored information, are produced in a scanned version, they shall be produced in multipage pdf format.

6.       If **you** perceive any ambiguities in a question, instruction, or definition, set forth the matter deemed ambiguous and the construction used in answering.  (Standard Instruction (e)).

7.       The Definitions contained in the following section should be used to determine the meaning of a particular request unless otherwise indicated by the context.  Consistent with the Committee Note to Maryland Form Interrogatory No. 2, defined terms have been printed in

bold type in order to flag the use of a defined term in the actual requests and to alert the responding party to the need to consult the definition. Efforts have been made to print all defined terms in bold type; however, if a term has been defined in these requests, but is not printed in bold type, the term nonetheless should be treated as if it were printed in bold type.

8.      Unless otherwise specified, these Requests call for **documents** from January 1, 2008 to the present.

9.      Pursuant to Rule 2-401(e), these Requests are continuing in nature.  If **you** obtain further **documents** or material information before trial, **you** are required to supplement **your** response promptly.  (Standard Instruction (c)).

## II.      DEFINITIONS

1.      "**Document**" includes electronically stored information and any writing, drawing, graph, chart, photograph, sound recording, image and other data or data compilation from which information can be obtained, translated, if necessary, through detection devices into reasonably usable form.  (Standard General Definition (a)). "**Document**" also includes any original, draft (whether disseminated or not) and any other copy.

2.      "**Communication**" means the transmittal of information by any means, including any oral conversation, transaction or interaction (including telephone calls) and any written transaction or interaction (including letters, memoranda, notes, telecopies, facsimiles, telex, electronic transmission of information or other transfer of **documents**). The transfer of **documents** between **persons** shall constitute a **communication**. Any internal conversation, transaction, or interaction (including any "memorandum to file") by, between or among any **persons**, directors, officers, employees, representatives, agents, consultants or other retained **persons** (including in house or outside retained attorneys), predecessors, successors, assigns, parent corporations, subsidiaries or affiliates also constitutes a **communication**.

4

3.      "**Person**" includes an individual, general or limited partnership, joint stock company, unincorporated association or society, municipal or other corporation, incorporated association, limited liability partnership, limited liability company, the State, an agency or political subdivision of the State, a court, and any other governmental entity.  (Standard General Definition (c)).

4.      "**Identify**," "**Identity**," or "**Identification**," (1) when used in reference to a natural **person**, means that **person**'s full name, last known address, home and business telephone numbers, and present occupation or business affiliation; (2) when used in reference to a **person** other than a natural **person**, means that **person**'s full name, a description of the nature of the **person** (that is, whether it is a corporation, partnership, etc., under the definition of **person** below), and the **person's** last known address, telephone number, and principal place of business; (3) when used in reference to any **person** after the **person** has been properly identified previously means the **person**'s name;  and (4) when used in reference to a **communication**, requires **you** to state the date, the author (or, if different, the signer or signers), the addressee, the identity of the present custodian of the **communication**, and the type of **communication** (e.g., letter, memorandum, telegram, or chart) or to attach an accurate copy of the **communication** to **your** answer, appropriately labeled to correspond to the request. (Based on Standard General Definition (b)).      "**Identify**," "**Identity**," or "**Identification**," when referring to a **communication**, means to set forth the date and place of the **communication**, whether the **communication** was oral, written or otherwise transmitted, any **document** embodying the **communication**, the **person** or **persons** who sent, received, participated in, or had knowledge of the **communication**, and the substance in detail of the **communication**.

5. **"Describe"** or **"state"** means to set forth fully and unambiguously every fact relevant to a specific and fully responsive answer to the request.

6. The term **"concerning"** means relating to, reflecting, referencing, describing, evidencing, constituting, or comprising.

7. The present tense includes the past and future tenses. The singular includes the plural, and the plural includes the singular. "All" means "any and all"; "any" means "any and all." "Including" means "including but not limited to." "And" and "or" encompass both "and" and "or." "Each" means "each and every." Words in the masculine, feminine or neuter form shall include each of the other genders. "Date" means the exact day, month and year if ascertainable, or, if not, the best approximation of the day, month or year, including any relationship to other events.

8. The term **"Complaint"** refers to the complaint filed by the Plaintiffs in this case and any subsequent amended complaint(s) and, if applicable, any third-party complaint. The terms "action," "case" or "litigation" refer generally to this case and all issues raised in this case.

9. The terms **"you"** or **"your"** include the **person**(s) to whom these requests are directed and any of that person's agents, servants, employees, representatives and attorneys.

10. The terms **"Pedestal Gardens"** and/or the **"Property"** mean the Pedestal Gardens Apartments situated in Baltimore City, Maryland as more fully described in the **Complaint** as amended, including but not limited to the residential units, common areas, limited common areas, leasing office, commercial shops, buildings, fencing, structures, parking lots, walkways, sidewalks and/or laundry and/or other facilities.

11. The term **"Plaintiffs"** includes all of the individual plaintiffs in this case and any additional **persons** that may be added as individual plaintiffs in the action, if applicable.

12.     The term **"Defendants"** means and includes all of the defendants in this case and any additional entities or persons that may be added as defendants in the action, if applicable.

13.     The term **"Co-Defendant(s)"** means and includes all of the defendants in this case, except **you**, and any additional entities or persons that may be added as defendants in the action, if applicable.

14.     The term **"TCB Pedestal Gardens"** means Defendant TCB Pedestal Gardens LLC.

15.     The term **"Interstate"** means Defendant Interstate Realty Management Company.

16.     The term **"Alexander Security"** means Defendant Alexander Security Consultants, LLC.

17.     The term **"MWR Investigations"** means Defendant MWR Investigations Inc.

18.     The term **"Security Companies"** means collectively Defendants **MWR Investigations** and **Alexander Security**.

19.     The term **"Community Builders"** means Defendant The Community Builders, Inc.

20.     The term **"Owner-operators"** and/or **"Owner-operator Defendants"** means collectively Defendants **TCB Pedestal Gardens**, **Interstate**, and **Community Builders**.

21.     The term **"Unidentified Security Officers"** means the unidentified individuals contracted for and retained by **Owner-operator Defendants** to perform security-related functions at **Pedestal Gardens**.

22.     The term **"Security Defendants"** means collectively Defendants **Alexander Security**, **MWR Investigations**, and **Unidentified Security Officers**.

7

23.     The term "**Security Officer(s)**" means any **Person** providing safety and/or security services at **Pedestal Gardens**.

24.     The term "**HUD**" means the United States Department of Housing and Urban Development, including any officers, agents, assigns, employees and/or representatives thereof.

25.     The term "**Housing Authority**" means the Housing Authority of Baltimore City, including any officers, agents, assigns, employees and/or representatives thereof.

26.     The term "**HAP**" means a housing assistance payment contract designed to supplement rental payments.

27.     The term "**BPD**" means the Baltimore City Police Department, including any officers, agents, assigns, employees and/or representatives thereof.

28.     The term "**Resident(s)**" means any **Person**, including the **Person's** children, charge(s), dependent(s), ward(s) and/or minor(s), who entered into a residential lease agreement with any of the **Owner-Operators** to live and/or reside at **Pedestal Gardens** from January 1, 2008 to present.

### III.     DOCUMENT REQUESTS

1.      All recorded statements, whether sworn or unsworn, orally or in writing that **you** have **concerning** the Housing Authority's revocation of the **Property's** multi-family license.

2.      All **documents concerning** any assets and/or policy or policies of insurance under which **you**, any insurer and/or third party might be liable to satisfy part or all of a judgment that might be entered in this action or to indemnify or reimburse **you** for payments made to satisfy such a judgment, specifically including **documents** identifying those assets and copies of such policies and any and all endorsements or addenda.

3.      All **documents concerning** any of the affirmative defenses asserted in **your** answer to the **Complaint**, as amended.

4.      All **documents you** identified or on which **you** relied in answering the **Complaint**, as amended.

5.      All **documents** or other tangible things that **you** intend to rely upon to support a position that **you** have taken or intend to take in the action.

6.      All **documents** that **you** contend are relevant to any of the claims and/or defenses in this litigation.

7.      All **documents** evidencing communications by **you** with any party to this litigation **concerning** safety and/or security services provided at the **Property** from January 1, 2008 to the present.

8.      All **documents** identified by **you** in **your** response to any Interrogatories served on **you** by any party in this case.

9.      All **documents** that **you** reviewed in preparing **your** answers to any interrogatories served on **you** by any party in this case.

10.     All **documents** that **you** reviewed in preparing **your** responses to any request for production of documents served on **you** by any party in this case.

11.     All **documents** identified by any other party in any response to any discovery served on that party in this case.

12.     All communications and **documents concerning** in any way the subject matter of this litigation, including matters set forth in the **Complaint**, the Answer, and any motions or oppositions thereto, between or among any **Person** or entity, including any **Person** or entity **you** contend was acting as an agent of any party to this litigation.

13.     All **documents concerning** any contractual relationship between or among **you** and any other **Co-Defendant**.

14.     All **documents** evidencing **communications** between or among **you** and any other **Co-Defendant** from 2008 to the present.

15.     All training manuals for any and all employees, representatives, agents, servants, contractors and/or subcontractors performing work and/or providing services at **Pedestal Gardens**, including, but not limited to, supervisors, regional directors, office workers, and/or **Security Officers**.

16.     All exhibits **you** intend to use in any deposition and/or at trial in this matter.

17.     All models, photographs, pictures, diagrams, films, videotapes or any other **documents** or objects which **you** intend to use as demonstrative evidence at the trial of this matter.

18.     All photographs, pictures, diagrams, films, videotapes, audiotapes or other **documents** or objects which **you** intend to introduce as evidence or otherwise utilize at the trial of this case.

19.     A current resume or curriculum vitae for all **Person(s)** that **you** intend to call as an expert witness at trial.

20.     All **documents** reviewed by any **Person** that **you** expect to call as an expert witness at trial, including any **documents** reviewed by that **Person** during any research or investigation of the issues involved in this litigation.

21.     All **documents** sent or provided to any **Person** that **you** expect to call as an expert witness at trial.

22.     All **documents** relied upon by any **Person** that **you** expect to call as an expert witness at trial.

23.     **Documents** sufficient to **Identify** or list the case name, case number and jurisdiction of any lawsuits in which any **Person** that **you** expect to call as an expert witness at trial provided testimony, whether in deposition or at trial or by affidavit.

24.     All transcripts of trial or deposition testimony or affidavits of all **Person(s)** that **you** expect to call as an expert witness at trial.

25.     All draft and final report(s) **concerning** this litigation of all **Person(s)** that **you** expect to call as an expert witness at trial.

26.     All **documents concerning** any communication between any party to this litigation or their counsel and any **Person** that **you** expect to call as an expert witness at trial.

27.     The complete file(s) **concerning** this litigation of any **Person(s)** you expect to call as an expert witness at trial.

28.     All **documents** obtained through any subpoenas issued to any **Person(s)** and/or entities not a party to this litigation.

29.     All **documents** produced, formally or informally, to or by any other party to this litigation, including **documents** received in response to any public information or similar request (excepting **documents** produced by **Plaintiffs**).

30.     All reports and related **documents** received by **you** from any **Person(s)** and/or entities that have performed investigations and/or inspections at the **Property**.

31.     All **documents**, industry standards, governmental regulations, statutes or laws, literature or tangible items which **you** maintain are relevant to the issues involved in this litigation.

32.     All accounting and financial records, including budgets, financial statements, balance sheets, trial balance sheets, income statements and/or profit & loss statements from 2008 to present **concerning Pedestal Gardens**.

33.     All **your** accounting and financial records, including budgets, financial statements, balance sheets, trial balance sheets, income statements and/or profit & loss statements from 2008 to present.

34.     All **documents** listing the name and address of all **Residents** from 2008 to present.

35.     All **documents** listing the name and address of all current **Residents**.

36.     All **documents** listing the address of all currently vacant units at **Pedestal Gardens**.

37.     All **Pedestal Gardens** visitor sign-in logs, sheets and/or books.

38.     All correspondence to and/or from the **BPD concerning Pedestal Gardens** and/or the **Residents**.

39.     All **documents concerning Resident** complaints, including complaint logs, entries, correspondence, sheets and/or books from 2008 to the present.

40.     All notes and/or messages **concerning Residents'** complaint(s) from 2008 to the present.

41.     All individual files maintained by **you** for all **Plaintiffs**.

42.     All phone messages, telephone logs and/or notes **concerning Pedestal Gardens** from 2008 to the present.

43.     All correspondence to and from **Residents** from 2008 to the present.

44.     All reports and/or **documents concerning** any investigation performed by **you** with regard to **Pedestal Gardens**.

45.     All reports and/or **documents concerning** any investigation performed by any other **Person** and/or entity with regard to **Pedestal Gardens**.

46.     All fire department records and/or calls for service at **Pedestal Gardens** from 2008 to the present.

47.     All police records and/or calls for service at **Pedestal Gardens** from 2008 to the present.

48.     All EMS records and/or calls for service at **Pedestal Gardens** from 2008 to the present.

11

49.     All witness and/or eye-witness reports, statements and/or accounts in **your** possession, custody and/or control **concerning Pedestal Gardens** and/or the **Resident** from 2008 to the present.

50.     All time records, time sheets, pay records and other **documents** that refer to and/or reflect the hours worked and the salary or wages paid to **your** employees, agents, servants, representatives, contractors, subcontractors, principals, members and/or officers **concerning** any work or services they performed at **Pedestal Gardens** from January 1, 2008 to present.

51.     All personnel files for **your** employees, agents, servants, representatives, contractors, subcontractors, principals, members and/or officers from January 1, 2008 to present.

52.     All **documents concerning** the identities of individuals and/or entities providing security services of any kind at the **Property** from 2008 to the present.

53.     All **documents concerning** the hiring, supervising, retaining, paying and/or employing of any **Security Officers** on the **Property** from 2008 to the present.

54.     All contractual agreements and addenda between **you** any other **Co-Defendant** for work and/or services provided at **Pedestal Gardens**, including any **documents** which modified or amended such agreements from 2008 to the present.

55.     All contractual agreements and addenda between **you** and any other **Person** and/or entity other than **Co-Defendants** for work and/or services provided at **Pedestal Gardens**, including any **documents** which modified or amended such agreements from 2008 to the present.

56.     All **documents**, including but not limited to notes, letters and/or meeting minutes, which in any way relate to any meetings, hearings, investigations and/or complaints **concerning your** activities, work and/or services provided at **Pedestal Gardens** from 2008 to the present.

57.     All **documents**, including but not limited to notes, letters and/or meeting minutes, which in any way relate to any meetings, hearings, investigations and/or complaints **concerning** any **Co-Defendants'** activities, work and/or services provided at **Pedestal Gardens** from 2008 to the present.

58.     All memoranda and correspondence **concerning** inspections, investigations, licensing and certifications **concerning** the **Property** from 2008 to the present.

59.     All certificates, licenses and/or documentation which **you** contend allow **you** to provide security services at **Pedestal Gardens**.

60.     All certificates, licenses and/or documentation which **you** contend allow **you** to provide armed **Security Officers** at **Pedestal Gardens**.

61.    All **documents concerning** emergency services provided by **you** to **Pedestal Gardens** and/or **Residents** from 2008 to the present.

62.    All **documents** that refer or relate in any way to any quotes, estimates, proposals and/or bids prepared and/or submitted to **you concerning** any work or services to be performed at **Pedestal Gardens** from 2008 to the present.

63.    All communications, correspondence and other **documents** (including, without limitation, e-mail communications) that **you** received from and/or provided to **Residents** from 2008 to the present.

64.    All communications, correspondence and other **documents** (including, without limitation, e-mail communications) that **you** received from and/or provided to **Plaintiffs** from 2008 to the present.

65.    All communications, correspondence and other **documents** (including, without limitation, e-mail communications) that **you** received from and/or provided to any **Person, Co-Defendant**, non-party and/or entity **concerning Pedestal Gardens** from 2008 to the present.

66.    All **documents you** received from and/or provided to any consultants and/or subcontractors hired to perform work and/or provide services at **Pedestal Gardens** from 2008 to the present.

67.    All correspondence, communications, invoices, agreements, proposals, contracts and other **documents concerning** security work and/or services performed and/or offered to be performed at **Pedestal Gardens** from 2008 to the present.

68.    All correspondence, communications, invoices, agreements, proposals, contracts, requirements contracts and other **documents concerning** payment provided to and/or received from any **Co-Defendant** for work and/or services related to **Pedestal Gardens** from 2008 to the present.

69.    All correspondence, communications, invoices, agreements, proposals, contracts, requirements contracts and other **documents concerning** payment provided to and/or received from any other **Person** and/or entity other than **Defendants** for work and/or services related to **Pedestal Gardens** from 2008 to the present.

70.    All **documents** evidencing **your** ownership and/or control, including all of **your** principals, members, officers and/or employees.

71.    All of **your** Declarations, Operating Agreements, By-laws, governing documents including any amendments thereto.

72.    All bills and invoices **you** have received from any contractor and/or subcontractor **you** hired and/or retained to perform security work and/or services **concerning Pedestal Gardens** from 2008 to the present.

13

73.     All time records, time sheets, pay records and other **documents** that refer to and/or reflect the hours worked and the salary or wages paid to **your** employees, principals, representatives, servants, members, agents and/or officers relative to any work or services **concerning Pedestal Gardens** from 2008 to the present.

74.     All time records, time sheets, pay records and other **documents** that refer to and/or reflect the hours worked and the salary or wages paid to **your** contractors and/or subcontractors relative to any work or services **concerning Pedestal Gardens** from 2008 to the present.

75.     All of **your** State and federal income tax returns for the years 2008 to the present, including all schedules attached thereto.

76.     All **documents concerning** inspections performed at the **Property** by **you** and/or any entity and/or **Person** hired and/or retained by **you** from 2008 to the present.

77.     All written policies, procedures, general orders, and/or regulations relating to security at **Pedestal Gardens** from 2008 to the present, including, but not limited to any and all policies and procedures relating to:

      a.    The application and renewal process for individual **Security Officers**;
      b.    The application and renewal process for firms offering to provide security services;
      c.    Background checks done of **Persons** applying for a **Security Officer** position;
      d.    The training requirements for **Persons** who are designated as **Security Officers**;
      e.    The **Identification of Security Officers** in police reports in situations where they supply probable cause;
      f.    The drafting of statements of probable cause by **Security Officers**;
      g.    The use of weapons, including firearms and/or tasers, by **Security Officers**; and
      h.    Citizen and/or **Resident** complaints involving **Security Officers**.

78.     All **documents concerning** training and supervision of **Security Officers** by **you** from 2008 to the present.

79.     All **documents concerning** training and supervision of **Security Officers** by any other **Co-Defendant** from 2008 to the present.

80.     All **documents** and/or records **concerning** the security cameras installed on site at **Pedestal Gardens**, including but not limited to archived film footage, maintenance and/or repair logs, installation protocols, receipts of purchase, **Resident** requests for film footage, **BPD** requests for film footage, **your** request for film footage and/or any other **Co-Defendants'** request for film footage from 2008 to the present.

14

81.     All background checks performed for individuals who provided security services at **Pedestal Gardens** from 2008 to the present.

82.     All background checks performed for individuals permitted to carry a handgun on the **Property** from 2008 to the present.

83.     All **documents concerning** performance evaluations of **your** employees, agents, servants, representatives, contractors, subcontractors, principals, members and/or officers from 2008 to the present.

84.     All **documents concerning** any complaints about any of the **Owner-Operator Defendants**, their employees, agents, servants, representatives, contractors, subcontractors, principals, members and/or officers from 2008 to the present.

85.     All **documents concerning** any complaints about any of the **Security Defendants**, their employees, agents, servants, representatives, contractors, subcontractors, principals, members and/or officers from 2008 to the present.

86.     All reservation of rights letter(s) sent by **you** or to **you** from any insurance carrier regarding this litigation.

87.     All **documents** not specifically requested in this Plaintiff's Request for Production of Documents which in any way pertain to the matters in this litigation.

88.     A full and complete copy of **your** files associated with **Pedestal Gardens**.

89.     If any **document(s)** is/are being withheld from production under a claim of privilege, produce a privilege log which sets forth: (a) the title of the **document(s)** being withheld; (b) a description of the **document(s)** being withheld; (c) the date of the **document(s)** being withheld; (d) the privilege under which the **document(s)** is/are being withheld; (e) the names and addresses of all recipients, including copy and blind copy recipients, of the **document(s)** being withheld; and (f) the name(s) and address(es) of the author(s) of the **document(s)** being withheld.

Nicholas A. Szokoly
Edward L. Cardona III
Saidah A. Grimes
Murphy, Falcon & Murphy
One South Street, Suite 2300
Baltimore, Maryland 21202
(410) 951-8744
*Attorneys for Plaintiffs*